**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THE CITY OF PLANTATION POLICE OFFICERS' EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:14-cv-1380 |
| | ) | |
| v. | ) ) | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |
| MICHAEL S. JEFFRIES, JAMES B. BACHMANN, BONNIE R. BROOKS, TERRY L. BURMAN, SARAH M. GALLAGHER, MICHAEL E. GREENLEES, ARCHIE M. GRIFFIN, ARTHUR C. MARTINEZ, DIANE L. NEAL, CHARLES S. PERRIN, STEPHANIE M. SHERN, CRAIG R. STAPLETON, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ABERCROMBIE & FITCH CO., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

1.      Plaintiff City of Plantation Police Officers' Employees' Retirement System ("Plaintiff" or the "System"), by and through its undersigned counsel, hereby submits this Verified Stockholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant Abercrombie & Fitch Co. ("ANF" or the "Company") against the members of its board of directors (the "Board"), seeking to remedy Defendants' breaches of fiduciary duties from at least August 15, 2011 to the present (the "Relevant Period").

2.      The allegations in this Complaint are made upon Plaintiff's personal knowledge with regard to its own acts and upon information and belief as to all other matters.  Plaintiff's information and belief is based upon, among other things, the investigation conducted by Plaintiff's derivative counsel, Bernstein Litowitz Berger & Grossmann LLP ("BLB&G").  This investigation included, among other things:

    a.   the review of Company materials obtained through a stockholder demand for the inspection of books and records under Section 220 of the Delaware General Corporation Law ("Section 220"),

    b.   interviews of and consultation with ANF investors,

    c.   consultation with corporate governance experts, and

    d.   the review of publicly available information, including news articles, Company filings with the United States Securities and Exchange Commission ("SEC"), research analyst reports, transcripts of conference calls with analysts, and numerous court documents filed in connection with litigation involving the Company or its senior officers.

3.      Further, with the Company's agreement, BLB&G conducted interviews of ANF Compensation Committee chair Michael E. Greenlees ("Greenlees") on July 15, 2014 and of ANF Audit Committee Chair James B. Bachmann ("Bachmann") on July 31, 2014.

## I.      **INTRODUCTION**

4.      Since 1992, Abercrombie & Fitch Co. has been an upscale retailer of youth clothing, operated under the direction of its Chief Executive Officer ("CEO"), Defendant Michael S. Jeffries ("Jeffries"). From the time of ANF's initial public offering ("IPO") in 1996 until mid-2008, the Company performed exceedingly well relative to its peers and on an absolute basis, with steady growth in the Company's earnings and its share price.

5.      From 2008 until mid-2014, however, the Company performed very poorly, both on an absolute basis and relative to its peers. For instance, between 2008 and 2013, with regard to earnings, ANF's peer group outperformed ANF by 369%, and the S&P 500 Apparel Retail Index outperformed ANF by 321%. Indeed, ANF's performance was so deficient that, by the end of fiscal 2013, ANF closed nearly 30% of its U.S. stores, and the Company suffered asset impairments and operating losses of over $500 million. ANF's stock price has declined from a high of $82.06 per share on February 1, 2008 to a closing price of $35.38 on January 29, 2014, when Plaintiff sent the ANF Board its initial Section 220 demand letter.

6.      Despite performance placing the Company in the "cellar" relative to its peers, however, the Company has rewarded Jeffries with a "penthouse" quality compensation package of over $140 million since 2008. Outraged by the complete disconnect between Jeffries's compensation and the Company's performance, ANF stockholders have beaten an ever-louder drumbeat demanding change, first to Jeffries's pay and eventually to the Board itself.

7. In 2012, only 25% of ANF stockholders voted in favor of the Company's executive pay proposal at its annual meeting. In 2013, that percentage dropped to 20%. In both years, ANF garnered the second worst "say-on-pay" score among S&P 500 companies. In addition, by late 2013, independent proxy advisory firms were lambasting ANF for Jeffries's outsized compensation, and large institutional stockholders were writing letters to the Company demanding change.

8. At the same time that the Board was paying Jeffries massive sums of money and the Company's performance was steadily declining, the Board learned about but did nothing to stop Jeffries from delegating managerial-like authority and access to key nonpublic ANF documents to his life partner, Matthew Smith ("Smith").

9. Smith was not an ANF director, officer of employee. Other than a general non-disclosure agreement executed on August 4, 2010, Smith owed no duties of loyalty, care or good faith to ANF or its public stockholders. His only obligation and priority was to Jeffries personally. Nevertheless, he participated in meetings discussing when and where to open new ANF store locations, reviewed nonpublic sales reports, and made unannounced store visits and subsequent reports based on his observations.

10. Moreover, the Board allowed Jeffries to incur massive travel-related costs on the Company's dime, including excessively expensive hotel stays, and a wide range of other gratuitous expenses.

11. The Board was well aware of stockholders' concerns about Jeffries' compensation. The Board also learned enough about Jeffries' improper granting of access to non-ANF employees and Jeffries's self-indulgence on the Company dime to require the Board to engage in further good-faith oversight and investigation, as well as requiring remedial actions.

12.     Compensation advisors advised the Board to re-negotiate Jeffries's employment agreement in order to align his compensation with the Company's performance, and the Board discussed stockholders' concerns about Jeffries's compensation.   Similarly, the Board held Board meetings that Smith attended, where nonpublic ANF information was discussed and key decisions were made.

13.     Despite knowing of those serious problems, however, until 2014, the Board paid lip service to reigning in Jeffries or otherwise addressing stockholders' concerns, and the Board's core focus was on doing the minimum necessary to placate stockholders.   Despite years of poor performance and vociferous stockholder calls for change, when the Board negotiated a new contract for Jeffries throughout 2013, it did not meaningfully tie Jeffries's compensation to ANF's future performance, or sufficiently increase Jeffries's accountability to the Board, the Company, and its stockholders.

14.     In January 2014, out of concern as a stockholder and based on its extensive investigation, Plaintiff sent a request for books and records to the Board and ANF's Corporate Secretary under Section 220, asserting that there was a reasonable basis to conclude that the Board members had breached their fiduciary duties.   Plaintiff sent a supplemental request under Section 220 in February 2014.

15.     After Plaintiff expressed its ongoing concerns and its willingness to pursue further litigation, the Board began to take meaningful corrective action.   As detailed below, working with Plaintiff and based on proposals Plaintiff developed in conjunction with retained corporate governance experts, the Board announced on April 7, 2014 numerous significant enhancements in order to align executive compensation and performance.

16.    However, despite positive developments related to compensation, the ethical, compliance, and fiduciary failures identified through Plaintiff's investigation persist at the Company.  Jeffries continues to impose significant costs on the Company and its stockholders, with insufficient oversight from the Board, while at the same time Jeffries gives authority and access to outsiders at will, also without meaningful Board oversight or adequate protection for the Company and its stockholders.  Accordingly, Plaintiff brings this action to remedy the breaches of fiduciary duty that will persist until and unless judicially corrected.

## II.    JURISDICTION AND VENUE

17.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.    This action is not brought collusively to confer jurisdiction on this Court that it would not otherwise have.

19.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein – including Defendants' breaches of fiduciary duty – occurred in this district.  Moreover, Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this district.

20.    Each Defendant has minimum contacts with this district as each has entered into contracts in the district, or has frequently traveled to the district on ANF business, or has authorized acts and actions that have had a sufficient impact in the district or on ANF's stockholders and investors residing here to justify the exercise of jurisdiction.

### III.     THE PARTIES

21.     Plaintiff The City of Plantation Police Officers' Employees' Retirement System is a single-employer defined-benefit retirement plan that provides retirement benefits to active and retired police officers of the City of Plantation, Florida, and their beneficiaries.  The System is presently a stockholder of ANF, has held ANF shares at all relevant times, and intends to continue to hold ANF shares at least through the resolution of this action.  For purposes of diversity jurisdiction, the System is treated as a citizen of Florida.

22.     Nominal Defendant Abercrombie & Fitch Co. is a specialty retailer that sells clothing and other lifestyle items through its stores and direct-to-consumer operations. ANF is a Delaware corporation with its principal executive offices located at 6301 Fitch Path, New Albany, Ohio 43054. The Company's common stock is listed and traded on the New York Stock Exchange under the symbol "ANF."

23.     Defendant Michael Jeffries has served as CEO of ANF since February 1992, and as a director since 1996. Defendant Jeffries served as President of the Company from February 1992 until May 1998, and served as Chairman of ANF from May 1998 until January 2014. Upon information and belief, Defendant Jeffries is a citizen of Ohio.

24.     Defendant James B. Bachmann has been a member of the Board since 2003, and currently serves as the chair of the Company's Audit Committee.  Upon information and belief, Defendant Bachmann is a citizen of Ohio.

25.     Defendant Bonnie R. Brooks ("Brooks") has been a member of the Board since June 2014.  Upon information and belief, Defendant Brooks is a citizen of Canada.

26. Defendant Terry L. Burman ("Burman") has been a member of the Board since January 2014. Upon information and belief, Defendant Burman is a citizen of Massachusetts.

27. Defendant Sarah M. Gallagher has been a member of the Board since June 2014. Upon information and belief, Defendant Gallagher is a citizen of New York.

28. Defendant Michael E. Greenlees has been a member of the Board since 2011, and currently serves as chair of the Company's Compensation Committee, and on the Audit Committee. Upon information and belief, Defendant Greenlees is a citizen of the United Kingdom.

29. Defendant Archie M. Griffin ("Griffin") has been a member of the Board since 2000, and currently serves as chair of the Company's Corporate Social Responsibility Committee. Upon information and belief, Defendant Griffin is a citizen of Ohio.

30. Defendant Arthur C. Martinez ("Martinez") is the non-executive Chairman of the Board, and has served in that capacity since joining the Board in January 2014. Upon information and belief, Defendant Martinez is a citizen of Connecticut.

31. Defendant Diane L. Neal ("Neal") has been a member of the Board since June 2014. Upon information and belief, Defendant Neal is a citizen of California.

32. Defendant Charles R. Perrin ("Perrin") has been a member of the Board since January 2014. Upon information and belief, Defendant Perrin is a citizen of New York.

33. Defendant Stephanie M. Shern ("Shern") has been a member of the Board since June 2014. Upon information and belief, Defendant Shern is a citizen of New Jersey.

34. Defendant Craig R. Stapleton ("Stapleton") has been a member of the Board since 2009, and currently serves as chair of the Nominating and Board Governance Committee, and serves on the Audit, Compensation, and Executive Committees. In addition, Defendant

Stapleton served as ANF's Lead Independent Director from February 2010 until January 2014. Upon information and belief, Defendant Stapleton is a citizen of Connecticut.

## IV.      SUBSTANTIVE ALLEGATIONS

### A.  HISTORY OF THE COMPANY

35.      ANF was originally founded in 1892 in New York City by David T. Abercrombie and Ezra Fitch.  ANF operated as an outfitter of high-end sporting and excursion goods until it filed for Chapter 11 bankruptcy in 1976, closing its flagship store the following year.

36.      In 1978, Houston-based chain Oshman's Sporting Goods ("Oshman's") purchased the ANF name and mailing list.  After operating as a mail-order retailer for several years, in 1988, Oshman's sold ANF to Columbus, Ohio-based clothing chain operator The Limited, then-owner of the Victoria's Secret brand, among others.

37.      In 1992, Leslie Wexner, CEO of The Limited, hired Defendant Jeffries to revitalize the ANF brand as its CEO and President.  Under Jeffries's management, ANF effectively re-launched as an upscale retailer of youth clothing.  Since he oversaw its birth and development in its modern form, Jeffries is widely considered and often referred to as the founder of the present-day ANF.

38.      ANF initially performed well under Jeffries's leadership and, in 1996, the Company held an initial public offering ("IPO").  ANF experienced relatively steady growth, with revenues and stockholder returns climbing between the 1996 IPO and early- to mid-2008.

### B.  THE BOARD FAILS TO ALIGN EXECUTIVE COMPENSATION WITH ANF'S PERFORMANCE

39.      From 2008 forward, however, the Company has performed poorly, both on an absolute basis and relative to its peers.  Between 2008 and 2013, ANF reported absolute returns of 94%, compared with absolute returns of 463% for its industry peer group and 416% for the

S&P 500 Apparel Retail Index.  Thus, over that time period, ANF's peer group outperformed ANF by 369%, and the S&P 500 Apparel Retail Index outperformed ANF by 321%.

40.    Indeed, ANF's performance was so deficient that, by the end of fiscal 2013, ANF closed nearly 30% of its U.S. stores.  Moreover, during that time period, the Company's investors suffered through asset impairments and operating losses of over $500 million.  ANF's stock price has declined from a high of $82.06 per share on February 1, 2008 to a closing price of $35.38 on January 29, 2014, the day that Plaintiff sent ANF its initial Section 220 demand letter, described below.

41.    Despite the Company's resoundingly poor performance, however, the Board has approved more than $140 million in compensation for Jeffries since 2008.

42.    As explained below, internal Company documents produced in response to Plaintiff's Section 220 Demand and other materials identified in Plaintiff's investigation confirm that: (i) the Board was aware that Jeffries's and other executives' compensation was not aligned with ANF's performance, (ii) ANF stockholders have forcefully expressed their disapproval with Jeffries's and other executives' compensation in light of the Company's poor performance; (iii) the Board was aware of and discussed stockholders' concerns, and (iv) the Board repeatedly sought to placate stockholders rather than address their underlying concerns and effectively align executive compensation with performance.

43.    During his July 15, 2014 interview, Defendant Greenlees acknowledged that, at the time he joined the ANF Board in February 2011, he was aware that the Company's stockholders believed that Jeffries's compensation was higher than the Company's performance warranted, and that changes to Jeffries's compensation would be appropriate.

44.     Minutes of a March 18, 2011 meeting of the Board reflect a presentation to the Board by Kevin Flatley ("Flatley"), Group Vice President for Compensation & Benefits at ANF, wherein Flatley noted that both stockholders and proxy advisory firms disapproved of Jeffries's contract, contributing to a risk that the Company would not receive majority stockholder support in the say-on-pay vote at that year's annual meeting.

45.     Rather than consider the merits of stockholder complaints (or independently admit that Jeffries's compensation was a substantive flaw in ANF's business and governance structure), however, the Board viewed stockholders' concerns regarding Jeffries's compensation as a mere public-relations problem.  During a March 22, 2011 meeting of the Compensation Committee, the Compensation Committee discussed a semi-annual award of over $38.7 million due Jeffries. In response to questions from the Compensation Committee, management agreed to create a communications plan regarding that massive award to Jeffries, rather than seeking in any way to revisit the award itself or explore ways to better align compensation with ANF's performance.

46.     Likewise, minutes of a June 15, 2011 joint meeting of the Compensation Committee and ANF's non-management directors state that the Company's interactions with stockholders established that Jeffries's contract was an issue of significant concern for ANF's stockholders.  Again, rather than address the underlying concerns, the directors present focused strictly on the Company's strategy for communicating with stockholders regarding executive compensation in light of the Company's performance.

47.     The Compensation Committee retained advisors from Compensation Advisory Partners ("CAP"), who made numerous presentations to the Compensation Committee and full Board regarding executive compensation at the Company and the significant gap between

compensation and performance. As a result, the Board knew that executive compensation was a substantive problem, not just a matter of stockholder perception.

48.     For instance, a January 19, 2012 presentation to the Compensation Committee, CAP highlighted that total executive compensation for fiscal 2010 was in the 90th percentile compared to peer groups, yet ANF's financial performance (*i.e.*, the benefits it created for investors, as opposed to Jeffries) was in the 10th percentile between fiscal 2008 and 2010. CAP also reported that Jeffries's reported perquisites for fiscal 2010 were $4.6 million, with the second-highest perquisites for a CEO in ANF's peer group totaling only $567,000. CAP further reported that alignment between pay and performance weakened in fiscal 2011, in light of Jeffries's massive compensation awards in that year.

49.     The Compensation Committee knew, from CAP and otherwise, that the Company's performance was not aligned with executive compensation, and that the divergence between compensation and performance was a significant problem at the Company throughout the Relevant Period. Defendant Greenlees agreed that the perquisites that Jeffries received in 2010 were egregious.

50.     Stockholders unequivocally made it known to the Company that they believed Jeffries's compensation was inappropriate in light of ANF's diminishing returns. Abercrombie had received just 56% stockholder support in the stockholder say-on-pay vote at the Company's 2011 annual meeting, and only 25% support in 2012.

51.     Any public-company board of directors acting in good faith would have responded and fairly considered the underlying reasons for a failed say-on-pay vote, and such glaring disparity between performance and compensation, by seeking to address the problems underlying the company's poor performance and the lack of incentives that actually aligned

performance and compensation.  Instead, the ANF Board remained focused on superficially appeasing stockholders.

52.    During a February 14, 2012 meeting of the Compensation Committee, Defendants indicated that the first compensation-related priority for the Company in 2012 was to maximize the Company's chance of receiving majority support in the stockholder say-on-pay vote at that year's annual meeting.  The Committee recognized that the Company's poor say-on-pay performance reflected stockholders' opposition to Jeffries's then-current contract.

53.    In light of the Company's poor say-on-pay vote, CAP made a presentation to the Compensation Committee on August 14, 2012, describing steps taken by companies that had performed poorly in say-on-pay votes in 2011, but then received overwhelming stockholder support in 2012.  CAP also provided a chart comparing the various elements of Jeffries's compensation (salary, bonus, total cash, incentive compensation, total compensation) with CEO compensation at ANF's peers.

54.    CAP suggested a number of courses of action for the Board to take, including its recommendation that the Board *negotiate a new employment agreement with Jeffries*, as well as increase the percentage of other executives' compensation tied to the Company's performance.

55.    CAP continued to inform the Board of ANF's shortcomings, particularly relative to its peers, in terms of executive compensation.  In a November 2012 presentation, CAP informed the Compensation Committee that, for the one-year period ended January 31, 2012, the Company's performance was in the 24th percentile of its peer group, and for the three-year period ended January 31, 2012, the Company's performance was in the *14th percentile* of its peer group, despite executive pay for 2011 in the 95th percentile relative to peers.  For fiscal 2011, Jeffries's reported perquisites were again higher than that of any peer CEO's.

56. Moreover, CAP reported that for fiscal 2011, Jeffries's total compensation of nearly $46 million was the highest in ANF's peer group, with Ralph Lauren coming in second at $36.5 million. As CAP reported, however, Ralph Lauren's performance was in the 90th percentile for 2011, and the 86th percentile for the 2009-2011 period. As noted, during the same time, ANFs financial performance was in the 24th percentile and 14th percentile, respectively.

57. As noted above, the Compensation Committee did not immediately attempt to re-negotiate Jeffries's employment contract, despite strong stockholder opposition and the Company's poor performance. Jeffries's contract was due to expire on February 1, 2014. In anticipation of the contract's expiration, the Compensation Committee, advised by CAP, negotiated with Jeffries over the course of 2013.

58. Negotiations opened with a February 26, 2013 proposal by the Company and a July 2013 response from Jeffries's representatives. In a September 9, 2013 response to Jeffries's representatives, CAP demonstrated once again that the Board was aware of and needed to do more to address the Company's poor performance and stockholder opposition to Jeffries's gross compensation. CAP noted that, in the time between the Company's February 26, 2013 proposal and the September 9 letter, the Company had lowered its earnings guidance and its share price had dropped by 18%. Moreover, CAP noted that the February 26 proposal had contained a $15 million sign-on grant that risked stockholder criticism, given that it was not standard practice for sitting CEOs, and further expressed concern that the July 2013 proposal from Jeffries would expose the Company to reputational risk. Further, in its September 9 letter to Jeffries's representatives, CAP listed a number of principles driving the Company's position, with the first such principle being avoiding additional public criticism of Jeffries's compensation.

14

59.     Stockholders continued to express their displeasure with Jeffries's compensation. The Company's executive compensation program received only 20% stockholder support in 2013, placing the company second-worst among all companies in the S&P 500 with regard to stockholder support and one of only six companies not to receive majority support.

60.     A November 19, 2013 presentation by CAP on Jeffries's compensation focused on how stockholders would receive a new agreement.  The first point that the November 19 presentation made was that the Board believed it was critical to offer Jeffries a package that stockholders would support.  CAP further noted that proxy advisory firms Institutional Shareholder Services ("ISS") and Glass Lewis would scrutinize and likely oppose a new contract for Jeffries, and that ISS and Glass Lewis support was critical to securing majority say-on-pay support from stockholders and avoiding recommendations from the advisory firms that stockholders vote out incumbent ANF directors.

61.     CAP noted that ISS and Glass Lewis had recommended against ANF's say-on-pay vote in 2013 out of a concern with excessive equity grants, the Company's failure to align executive pay with performance, and for failing to adequately respond to the prior year's failed say-on-pay vote.  CAP specifically identified for the Board six risks that the Company faced as a result of its executive-compensation practices.  Only one of those risks concerned the Company's performance.  The other five related to public-relations issues or concerns that stockholders might hold incumbent directors to account absent an overhaul of Jeffries' contract.

62.     Ultimately, after continued negotiations, Jeffries entered into a new employment agreement with the Company on December 9, 2013.  The Company and Jeffries agreed to terms including a base salary of $1.5 million annually, long-term incentive awards of at least $6 million annually (but which may be increased at the Compensation Committee's sole discretion),

an annual target bonus of at least 150% of base salary and up to 300% of base salary, and various benefits.

63.     The Board's stated goals in negotiating a new contract for Jeffries were (i) better aligning Jeffries's compensation with the Company's performance in order to hold Jeffries and management generally more accountable, (ii) to reflect best practices and bring ANF in line with its peers' compensation practices; and (iii) provide the Board with the ability to install a CEO other than Jeffries if future events warranted such a change.

64.     While each of these stated goals are proper, the new Jeffries employment contract that the Company actually approved in December 2013 did not sufficiently increase accountability, nor did it meaningfully align Jeffries's compensation with ANF's performance. And the contract did not conform to best practices or bring Jeffries's compensation package in line with the CEO contracts of the bulk of ANF's peers.

65.     Jeffries's new contract did little to effectively align his compensation with the Company's performance.  Indeed, under the terms of Jeffries's new employment agreement, as agreed to on December 9, 2013, the bulk of Jeffries's compensation was not tied to adequately meaningful performance standards.  On top of Jeffries's $1.5 million base salary for fiscal 2014 and cash awards of up to $4.5 million for which he is eligible, under the terms of his agreement, Jeffries was due to receive up to $6 million in ANF equity awards, at least 60% of which was subject to unspecified criteria determined solely by the Compensation Committee (rather than by any defined metrics).

66.     In other words, despite the Company's recent poor performance, the new contract provided that the majority of Jeffries's compensation would depend only on the unfettered discretion of the Board, and not on specific and objective performance goals.

C. **THE BOARD'S FAILURE TO IMPLEMENT AND ENFORCE INTERNAL CONTROLS OVER ETHICS AND COMPLIANCE**

67.     Despite credible "red flags" of internal wrongdoing, the Board failed to implement and enforce internal controls over ethics and compliance.

68.     As explained below, based on Plaintiff's investigation and internal Company documents produced in response to Plaintiff's Section 220 Demand, it is clear that: (i) the Board knew or should have known that Jeffries's life partner, Matthew Smith, enjoyed improper access to nonpublic ANF documents and played a manager-like role in the strategy for the Company's real estate, and (ii) Jeffries misused Company resources with little-to-no meaningful oversight.

### 1.  The Board's Acquiescence to Jeffries's Delegation to Non-Employees of a Managerial-Type Role and Access to Nonpublic ANF Documents

69.     Both prior to and during the Relevant Period, Defendant Jeffries provided his life partner, Matthew Smith, with access to nonpublic Company documents and allowed him to exercise key managerial functions concerning valuable real estate and store-expansion strategies, all with no meaningful oversight.

70.     Smith has never been an ANF employee or fiduciary, or otherwise accountable to the Board.

71.     Indeed, Smith has at times been adverse to ANF, and in all instances has acted on behalf of Jeffries, not the Company.  He heads The Jeffries Family Office, which is Jeffries's personal family investment fund.  In that capacity, he has played a central role in negotiating on Jeffries's behalf during contract negotiations with ANF.

72.     During a June 18, 2012 deposition in an unrelated matter, Smith testified under oath that, among other roles he plays on behalf of Jeffries, Smith "negotiate[s] his compensation." Smith also played a role representing Jeffries during the negotiations of Jeffries's new contract in 2013, and advises Jeffries with regard to goings-on at the Company.

17

73.     The real estate aspect of ANF's business is crucial to the Company, as its growth plans are heavily reliant on sales from new international stores. In addition, with domestic stores closing at an alarming rate, decisions concerning where to open and close the Company's stores are of the utmost importance. Allowing someone with no duties to the Company or its stockholders, to participate in such important decisions leaves the Board, management, and stockholders without any way to hold key decision makers accountable.

74.     Nevertheless, Jeffries delegated to Smith a role at the Company, and access to nonpublic ANF information, since at least December 2007, if not earlier.  Smith even attended a meeting of the Board in either December 2006 or December 2007, wherein the Board discussed nonpublic information, including ANF's strategic plans for the ensuing several years, such as expansion opportunities and financial plans.  At that meeting, members of ANF management made presentations to the Board, including nonpublic, proprietary ANF information concerning finance, marketing, branding, and strategic planning.  No member of the Board challenged the propriety of Smith's presence at the meeting or asked whether Board members had any duty to the Company to limit or otherwise oversee his access to and involvement in Company affairs.

75.     On August 4, 2010, Smith executed a Non-Disclosure Agreement with the Company (the "NDA") , which allowed him to access proprietary ANF documents and facilities, without limitation, for any purpose and indefinitely into the future.  However, neither the Audit Committee nor the full Board was aware of the NDA, which in any event did not create any fiduciary obligations to the Company or its stockholders.

76.     Moreover, Defendant Bachmann, present chair of the Audit Committee and a longstanding Board member, stated during his July 31, 2014 interview that he (i) was not aware of even an estimate of the number of individuals who entered into non-disclosure agreements

with the Company similar to the NDA, (ii) did not know who would have seen the NDA or been aware of its existence, (iii) did not know whether there were any reports to the Board or to Internal Audit regarding non-employees with access to nonpublic ANF information, and (iv) did not recall any parameters used to determine whether it was appropriate for a non-employee to enter into an agreement with the company similar to the NDA. As to Smith, in particular, Bachmann insisted that he was not aware of confidential Company information that was provided, or of instances when Smith actually directed or made managerial decisions for ANF.

77. Defendant Bachmann indicated during his July 31, 2014 interview that, at some point between 2011 and the present, Bachmann became aware that Smith was involved in identifying and selecting real-estate locations for ANF store openings, particularly in Europe. Bachmann raised that involvement with the Company's General Counsel at the time, but did not raise any concerns about Smith's access and role with the Audit Committee or full Board. There is no indication of any follow up inquiry, by the former General Counsel or otherwise.

78. Travel logs for the ANF jet produced in response to the Section 220 Demand show that Smith accompanied Jeffries on more than 95% of the business trips that Jeffries took during the relevant period. In addition, the manual for the crew of the ANF jet, produced in discovery in an unrelated matter, shows that Smith received daily nonpublic ANF sales reports when traveling on the jet.

79. The ANF flight crew manual also revealed that sales reports reviewed aboard the ANF jet are housed not on ANF's computer network, but on The Jeffries Family Office's computer network. In other words, highly confidential ANF data was hosted by The Jeffries Family Office, rather than by ANF itself.

80. The ANF flight crew manual also included the location of nonpublic sales reports, as well as the password to access them. All of the flight attendants, pilots, or other personnel with access to the manual have therefore been able to access high-level, nonpublic ANF information.

81. Further, internal ANF documents demonstrate that between August 3, 2011 and November 29, 2013, Smith made approximately 170 unannounced visits to ANF stores around the world, providing reports on the stores' appearances, staffs, and atmosphere. The Board was not aware of those unannounced store visits, never saw reports of those visits, and was not aware of who received such reports.

82. ANF's Internal Audit already has a program in place that includes visiting stores to monitor whether individual stores conform with the Company's policies and procedures. The Audit Committee received high-level summaries of Internal Audit's reports of store visits. Thus, when a third party conducts audit-like activities, they are plainly outside the scope of the structure put in place by the Board to achieve store-level oversight. Moreover, while the Audit Committee could ask Internal Audit any follow-up questions or address particular concerns that Internal Audit identified, the Audit Committee had no similar way to respond to or follow up on an outsider's unregulated reports of store visits.

83. Smith also apparently participated in regularly scheduled "Real Estate Meetings," and was particularly active in discussions of store openings and closings outside of the United States. For instance, minutes of numerous Real Estate Meetings show that Smith played a direct role in assessing the opening or closing of stores in various places around the world, including Vienna, Frankfurt and Shanghai.

84. The Board should not have been ignorant of the depth of Smith's activities. On May 22, 2013, online news source Buzzfeed published a lengthy article (the "Buzzfeed article") titled "Abercrombie Execs Troubled By Involvement Of CEO's Partner." The Buzzfeed article was based on interviews with six current and former ANF executives and other employees, and detailed the ways that Smith "wields vast influence over the retailer's operations and strategic direction."

85. The Buzzfeed article reported that Jeffries:

has involved his partner in managing a linchpin of . . . A&F's growth plan, the real estate expansion – with Smith playing a role in choosing the locations of new stores overseas. Smith goes solo to monthly real estate meetings at the Company's New Albany, Ohio headquarters with a seat by the chief financial officer and gets weekly real estate briefings from Abercrombie executives, sources said. At times, it's unclear if Smith is just relaying information to Jeffries and then carrying out his wishes – as when Smith nixed a deal in Europe that Abercrombie had already signed a lease on – or if he's acting as an executive in his own right, one former executive said.

86. In addition, the Buzzfeed article made clear that there were underlying concerns given Smith's lack of accountability, stating that "[t]wo former executives used the word 'dangerous' when describing Smith, citing the fact that he is organizationally unaccountable if something were to go wrong with regard to a decision he's made."

87. The Buzzfeed article went on to quote sources who said that David Leino, ANF's Senior Vice President of Real Estate, has "joked with colleagues that he works for Smith and has spoke[n] openly of having to run off to his 'Matthew meetings.'"

88. Despite the Buzzfeed article, Smith's access and influence at the Company continued unabated. Moreover, Defendant Bachmann, chair of the Audit Committee, stated during his July 31, 2014 interview that he did not recall seeing the Buzzfeed article prior to July

31, 2014.  The Board did not discuss the Buzzfeed article and the concerns raised therein, and was not aware that Smith receives nonpublic ANF real-estate reports.

89.     Smith attended a meeting of the Board in September 2013, wherein the Board discussed nonpublic information, including ANF's strategic plans for the ensuing several years, such as expansion opportunities and financial plans.  At that meeting, members of ANF management made presentations to the Board including nonpublic, proprietary ANF information concerning finance, marketing, branding, and strategic planning.

90.     At that time, despite the Board knowing that Smith represented Jeffries in negotiations with the Company but also played a role in the Company's store selection and identification process – as an advisor to Jeffries, and not to ANF – the Board did not discuss internally or with ANF's general counsel whether Smith's role at the Company was appropriate.

### 2.  The Board's Indifference to Jeffries's Misuse of Company Resources

91.     The Board failed to exercise adequate oversight in connection with Jeffries's business travel, and allowed Jeffries to accumulate massive travel-related expenses throughout the Relevant Period.  Moreover, the Board tolerated the creation of a corporate culture that resulted in completely avoidable lawsuits that tarnish the Company.

92.     For instance, expense reports produced in response to the Section 220 Demand show that, during the Relevant Period, Jeffries's hotel stays cost the Company significantly excessive amounts.

93.     According to the Board, when Jeffries travels on ANF business, Jeffries uses his hotel rooms to conduct business, including holding meetings.  However, the Board has not identified specific reasons that Company business would require ANF spending significantly excessive amounts per night for Jeffries's hotel rooms.

94. Further, Jeffries incurred significantly outsized expenses by unnecessarily traveling by helicopter.

95. Although the Board was aware of Jeffries's use of Company resources for personal travel and other activities, as well as his gratuitous expenses on helicopters generally, it did not focus on or review the propriety of his conduct and use of Company funds.

96. Moreover, the Board was on notice of serious issues regarding ANF's corporate culture that exposed the Company to substantial financial liability, including credible allegations of ethical misconduct and compliance failures at the Company. Specifically, in 2010, a former pilot of the ANF jet raised an age-discrimination lawsuit against ANF, based in part on Jeffries's and his colleagues' behavior on the plane and managerial decisions. Filings in *Bustin v. Abercrombie & Fitch Co.*, Case No. 10-cv-1675 (E.D. Pa.) – including Smith's own deposition testimony and the ANF flight crew manual – detailed a corporate culture of disregard for ethics and compliance and a lack of meaningful oversight over those key areas. The *Bustin* matter settled for a significant monetary amount in 2012.

## D. PLAINTIFF USES THE "TOOLS AT HAND" TO CONDUCT A DETAILED INVESTIGATION OF ITS ALLEGATIONS

97. On January 29, 2014, following an initial investigation by Plaintiff's counsel, Plaintiff sent a letter (the "January 29 Letter") to the Board and to ANF's Corporate Secretary, demanding inspection of the Company's books and records under Section 220 of the Delaware General Corporation Law in order to investigate potential breaches of fiduciary duty by the Board.

98. The Board responded on or about February 10, 2014, raising various objections to the January 29 Letter and certain other defenses and objections, but also stating that it would consider producing certain responsive documents.

99.     On February 28, 2014, Plaintiff sent a second letter to ANF's Board and Corporate Secretary, supplementing the January 29 Letter, laying out further bases for Plaintiff's requests, and setting forth additional document requests (the "February 28 Letter" and, together with the January 29 Letter, the "Section 220 Demand").

100.     In the Section 220 Demand, the System asserted that it had a reasonable basis to demand access to ANF's books and records.  The Section 220 Demand set forth specific allegations of fact, based on the extensive investigation of counsel, regarding potential breaches of fiduciary duty at the Company.

101.     The System and its counsel believed the allegations in the Section 220 Demand satisfied the standards of Section 220 to justify the System investigating whether ANF's Board and/or ANF's CEO had breached fiduciary duties to ANF and/or its public stockholders in connection with purported:  (i) approving compensation, expense reimbursement and related payments for Jeffries and other Company executives; (ii) failing to adequately oversee the Company's ethics and legal and accounting compliance controls; and (iii) providing Smith, a non-ANF employee who had no fiduciary obligations to the Company with access to proprietary, nonpublic information and Company resources, as well as allowing him to play a role in certain aspects of the Company's strategic decision making.  The Section 220 Demand also inquired into the independence of the then-current Board members, and the state of certain of ANF's internal controls and policies.

102.     On February 21, 2014, and on six dates thereafter, in response to the Section 220 Demand, the Company produced hundreds of responsive internal corporate documents for review, and confirmed that various publicly available documents (such as Committee charters and other corporate filings) were accurate and could be relied upon in the context of this matter.

103.    Based on its review of the documents that the Company produced in response to the Section 220 Demand, as well as Plaintiff's prior and ongoing independent investigation of the matters set forth in the Section 220 Demand, Plaintiff determined that it had a valid basis to bring a derivative action on behalf of the Company alleging that Defendants breached their fiduciary duties in connection with executive compensation and corporate governance failures at the Company in the areas of ethical and compliance management, and internal controls.

**E.  ANF FINALLY TAKES MEANINGFUL STEPS TO ALIGN EXECUTIVE COMPENSATION WITH THE COMPANY'S PERFORMANCE**

104.    In connection with its preparation for litigation, Plaintiff retained corporate governance experts.  Concurrent with its preparation for litigation, Plaintiff asked its experts to help identify potential governance failures at ANF and to craft specific proposals to address those failures.

105.    In early March 2014, while documents were being produced, Plaintiff, through its counsel, indicated to the Board's counsel that the System strongly believed there were valid claims that could be pursued through litigation, but that it believed that in light of recent developments at the Company, Plaintiff would invite the Board to resolve Plaintiff's claims without resort to extensive litigation.  Plaintiff indicated that it was prepared to provide a demand with respect to ways in which the Board could seize better control over the Company's affairs, cure the breaches of duty that gave rise to Plaintiff's claims, and create significant value for all ANF stockholders for many years into the future.

106.    After several rounds of discussions, the Board's counsel invited Plaintiff to make a demand to resolve Plaintiff's claims.

107. In consultation with its experts, on March 18, 2014, Plaintiff sent a preliminary set of ethical and compliance management, internal controls, and executive compensation demands to ANF. Extensive discussions among the parties regarding the substance of those demands followed.

108. With regard to Jeffries's and other executives' compensation, Plaintiff presented the following proposals to the Board, among other things:

      a. If awarded, 100% of long-term incentive awards for Jeffries should be subject to performance-based conditions, rather than the 60% set forth in Jeffries's 2014 employment agreement;

      b. For ANF executives, both annual cash bonuses and performance-related equity incentives should be subject to multiple challenging performance metrics, including some non-financial metrics;

      c. Such chosen financial metrics must not be subject to the adjustments currently authorized, which comprise standard business costs directly related to management decisions, rather than one-off items that should properly be excluded from performance considerations; and

      d. Time vesting restricted stock and stock appreciation rights should make up no more than 20% of total long-term incentives for named executive officers other than Jeffries.

109. On April 7, 2014, the Company filed a Form 8-K with the Securities and Exchange Commission stating that, on March 31, 2014, the Board's Compensation Committee made "a number of significant changes" to the Company's executive compensation structure, designed to better "support critical business objectives and align with stockholders' interests." The Form 8-K acknowledged that these changes "reflect[ed] extensive input from stockholders of the Company."

110. The changes to the Company's executive compensation structure announced in the Form 8-K adopted, in substantial part, the content and wording of the System's March 18, 2014 proposals with respect to executive compensation.

26

111.    Specifically, the Company announced that:

The [Compensation] Committee has made a number of significant changes to the structure of the 2014 equity awards, *reflecting extensive input from stockholders of the Company* and the Company's ongoing commitment to best practices in executive compensation and corporate governance.  The Committee believes that the approach adopted in respect of the 2014 equity awards will support critical business objectives and align with stockholders' interests. Specifically, the Committee has closely linked the 2014 equity awards with challenging performance targets intended to reflect a significant improvement in the Company's business results, *in order to further align executive compensation with the Company's stated operational goals* of improving margins, maintaining a disciplined approach to capital allocation, and delivering significant improvements in returns to stockholders.

The Company and the Committee will continue to review performance-based compensation metrics in light of prevailing best practices.

*For the Company's Chief Executive Officer, Mr. Jeffries, 100% of his 2014 equity award was in the form of performance shares.*  For the Company's Chief Operating Officer and Chief Financial Officer, Mr. Ramsden, 75% of his 2014 equity award was in the form of performance shares, with the remaining 25% in the form of stock appreciation rights.

The performance shares will be earned (and become vested) following the end of Fiscal 2016 depending on the level of achievement against *three equally-weighted performance metrics, comprised of Relative Total Shareholder Return ("TSR"), Return on Equity ("ROE"), and improvement in Earnings Before Interest and Taxes ("EBIT") margin ("EBIT Margin Improvement")*.

Relative TSR will be measured over *a three-year performance period*. In order to earn any Relative TSR performance shares, Relative TSR for the performance period must exceed the 30th percentile of the defined peer group, with the Target payout achieved at the 60th percentile of the peer group and the Maximum payout achieved at or above the 90th percentile. The peer group for this purpose will be all companies in the S&P Retail Select Industry Index at both the beginning and the end of the performance period.

For Mr. Jeffries, no payout will be earned for the performance period if TSR is negative in absolute terms. For other participants, the payout for the performance period will be capped at Target if TSR is negative in absolute terms.

The ROE metric will be measured on an average basis over a three-year performance period and calculated as GAAP Net Income for each year divided by the 5-point average quarterly stockholders' equity for the year. To achieve the Target level of performance, the Company will be required to achieve an average ROE of 15% over the three-year performance period. No payout will be earned for average ROE below 10.5%, and the Maximum payout will be earned for average ROE of 20% or greater.

The EBIT Margin Improvement metric will be set by the Committee on an annual basis over the three-year performance period. Achievement of the metric will be measured by comparing the prior year and current year adjusted EBIT margins to measure the degree of improvement. Adjusted EBIT margin is a non-GAAP metric, since reported results for each of the prior and current periods will be adjusted to exclude certain items that, in the view of the Committee, do not reflect the underlying margin improvement that this metric is intended to motivate and incentivize. For 2014, achievement of the Target level of performance will require the Company to achieve 175 basis points of EBIT Margin Improvement when comparing Fiscal 2014 (i.e., the fiscal year ending January 31, 2015)'s adjusted EBIT margin versus the Fiscal 2013 (i.e., the fiscal year ended February 1, 2014)'s adjusted EBIT margin of 5.41%. There will be no payout for EBIT Margin Improvement of less than 100 basis points, and the Maximum payout will be earned for EBIT Margin Improvement of 250 basis points or greater. No payout against this metric will be made for Fiscal 2014 performance if actual adjusted EBIT (in dollar terms) for Fiscal 2014 is below Fiscal 2013's adjusted EBIT of $222.9 million.

112.    In other words, consistent with and in consideration of Plaintiff's proposals, the Compensation Committee exercised its discretion to make the vesting of 100% of Jeffries's 2014 equity grants subject to performance-based conditions.

113.    In addition, consistent with and in consideration of Plaintiff's proposals, the Compensation Committee granted performance shares to ANF's CEO, Chief Operating Officer, Chief Financial Officer, and Executive Vice Presidents containing multiple challenging performance metrics.  As a result, any vesting of performance-based shares will in the future depend on achievement of multiple metrics that are intended to be difficult to reach, and would

reflect significant improvement in the Company's business results.  In other words, ANF's senior officers will be paid more only if ANF's stockholders enjoy greater corporate value.

114.    Consistent with and in consideration of Plaintiff's Proposals, the Compensation Committee also determined that the Return on Equity metric would be calculated using GAAP Net Income without any adjustments to reported results.

115.    Each of the compensation-related enhancements that the Company announced reflect Plaintiff's input and specifically address concerns raised by Plaintiff relating to executive compensation, including in the Section 220 Demand.  Each of those enhancements also will likely inure to the benefit of the Company and its stockholders.

116.    Indeed, during his July 15, 2014 interview, Defendant Greenlees represented that Plaintiff's proposal has enabled the Board to highlight and enhance accountability at the Company vis-à-vis Jeffries and other executives.  Greenlees specifically stated that Plaintiff's proposals in particular provided necessary, additional impetus to better align executive compensation with ANF's performance, which would ultimately improve ANF's performance and create stockholder value as a result.

117.    ISS has also recognized the value of ANF's announced compensation-related enhancements.  ANF had previously received an ISS corporate governance "QuickScore" of 10, which is the worst ranking for corporate governance that ISS delivers.  In June 2014, ISS indicated that in light of recent changes at ANF, including in particular the compensation-related enhancements discussed herein, ANF received ISS's highest score, a 1.  According to ISS Vice President Chris Caras, "To see them move from a 10 to a 1, that's as big a jump as you can make. . . . I'm not sure I've seen accompany move from one extreme to another in that time."

118.    As discussed herein, however, although the Board adopted certain changes to its executive compensation practices and procedures in response to Plaintiff's demand and proposals, the Board has not resolved all claims for breach of fiduciary duty.  Until appropriate relief is provided on account of all of the Board's alleged breaches, Plaintiff will continue to pursue its claims.

## V.    DEFENDANTS' FIDUCIARY DUTIES

119.    By reason of their positions as directors and fiduciaries of ANF and because of their ability to control the business and corporate affairs of the Company, Defendants owed ANF and its stockholders fiduciary obligations of care and loyalty, and were and are required act in good faith as directors of the Company.

120.    Defendants were and are required to act in furtherance of the best interests of ANF and its stockholders so as to benefit the Company and its stockholders, and not in furtherance of Jeffries's or any other individual's personal interest or benefit.  Each director and officer of the Company owes to ANF and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

121.    To discharge their duties, the directors of ANF were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the directors of ANF were required to, among other things:

a.  Align executive compensation with Company performance so as to adequately incentivize executive performance and reward executives for positive results;

b.  Seriously consider stockholders' input with regard to executive compensation, rather than seek to placate stockholders without making any meaningful change;

30

      c.   Restrict access to confidential ANF documents and information and impose and enforce internal controls to limit such access; and

      d.   Impose and enforce internal controls over ethics and compliance, including by monitoring and restricting Company spending related to Jeffries's travel.

122.    Indeed, the Company's Code of Business Conduct and Ethics (the "Ethics Code") specifically provides that the Company's officers and directors, among other individuals, to "act in accordance with the law, fully considering the Company's rights, interests and ethical responsibilities."   The Ethics Code explicitly states that it was adopted by the Board "to demonstrate to the public and A&F's stockholders the importance that management and the Board of Directors place on ethical conduct."

## VI.    <u>DERIVATIVE ALLEGATIONS</u>

123.    Plaintiff brings this action derivatively in the right and for the benefit of ANF to redress the breaches of fiduciary duty by Defendants as alleged herein.

124.    Plaintiff will adequately and fairly represent the interests of ANF and its stockholders in enforcing and prosecuting its rights, and has retained counsel experienced in prosecuting this type of action.

125.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein this section.

126.    At the time this derivative action was initiated, the Board comprised each of the Defendants.  Plaintiff did not make any pre-suit demand on the Board to institute this action because, as further alleged herein, a majority of Defendants engaged in conduct that is not a legitimate exercise of business judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule.  For the reasons discussed herein, making such a demand would be a futile, wasteful, and useless act.

127. Plaintiff has not made a demand on the ANF Board to bring suit asserting the claims set forth herein because pre-suit demand was excused as a matter of law because a majority of the Board engaged in conduct that is not a legitimate exercise of business judgment and, therefore, cannot enjoy the protections of the business judgment rule.

128. The Individual Defendants' challenged misconduct at the heart of this case constitutes serious, knowing, and conscious breaches of fiduciary duties to the Company and its stockholders.  Each of the Individual Defendants has adopted, ratified, implemented, and/or condoned the governance, ethics, and compliance failures described herein, including the failures to implement and enforce adequate internal controls over ethics and compliance, and has been aware of numerous "red flags" during the Relevant Period that necessarily informed them of those failures at ANF.  Given the duties of the members of the Board, any lack of knowledge of the governance, ethics, and compliance failures at the Company could be the product only of willful blindness that constitutes a bad faith breach of fiduciary duty.

129. Each of the Individual Defendants has failed to properly align Jeffries's and other executives' compensation with the Company's performance, failed to implement and enforce internal controls related to ethics and compliance, and acquiesced in Jeffries's delegations of authority and access to non-ANF employee Smith.  The Individual Defendants knew of and enabled these serious breaches as described herein, yet have not taken adequate steps to prevent or remedy those breaches.

130. Despite the Individual Defendants' knowledge throughout the Relevant Period of misconduct at the Company, as well as the risks that such misconduct posed to ANF's financial performance, the Individual Defendants failed to, address and correct that misconduct in a timely

fashion.   Indeed, it was not until Plaintiff's Section 220 Demand that the Compensation Committee belatedly took meaningful steps to align executive compensation with performance.

131.    In short, as the ultimate decision-making body of the Company, the Individual Defendants affirmatively adopted, ratified, implemented, and/or condoned conduct and decisions that constituted breaches of their duties to the Company and its stockholders, and were lacking in good faith.  Such breaches are not legally protected business decisions, and such conduct can in no way be considered a valid exercise of business judgment.  Accordingly, demand on the Board is excused.

## VII.   CAUSES OF ACTION

### COUNT I
### Breach of Fiduciary Duty
### (Derivatively Against Individual Defendants)

132.    Plaintiff repeats and realleges the preceding paragraphs as set forth above and incorporates them herein by reference.

133.    The Individual Defendants, as directors of ANF, are fiduciaries of the Company and its stockholders. As such, they owe the Company the highest duties of good faith, fair dealing, due care, and loyalty.

134.    In addition, the Board had specific fiduciary duties as defined by the Company's corporate governance documents, and principles that, had they been discharged in accordance with the Board's obligations, would have necessarily prevented the breaches and misconduct during the Relevant Period and the consequent harm to the Company and its stockholders alleged herein.

135. The Individual Defendants consciously violated their fiduciary duties and corporate responsibilities in at least the following ways:

    a. Failing to align Jeffries's and other executives' compensation with ANF's performance so as to adequately incentivize executive performance and reward executives for positive results;

    b. Failing to seriously consider stockholders' input with regard to executive compensation, rather than seeking to placate stockholders without making any meaningful change;

    c. Failing to restrict access to confidential ANF documents and information and impose and enforce internal controls to limit such access; and

    d. Failing to impose and enforce internal controls over ethics and compliance, including by monitoring and restricting Company spending related to Jeffries's travel.

136. As a direct and proximate result of the Individual Defendants' conscious failure to perform their fiduciary duties, ANF has paid out excessive sums in compensation and expenses to Jeffries and other executives, and has allowed access to nonpublic information to non-employees with no duties to the Company or its stockholders. Thus, as a result of the Individual Defendants' breaches, ANF has sustained, and will continue to sustain, significant damages, both financially and to its corporate image and goodwill. Such damages include, and will include, lost revenues, exposure to legal claims, and other liabilities described herein.

137. As a result of the breaches and misconduct alleged herein, the Individual Defendants are liable to the Company.

**WHEREFORE**, Plaintiff demands judgment as follows:

    (a) Determining that this action is a proper derivative action maintainable under law and demand is excused;

    (b) Declaring that the Individual Defendants named herein have breached their fiduciary duties to the Company, as alleged herein;

    (c) Directing that ANF and the Individual Defendants take all necessary actions to reform and improve ANF's corporate governance and internal controls, policies, and procedures, and to protect the Company and its stockholders from a recurrence of the

damaging events described herein, including by directing that ANF adopt, maintain, execute, and oversee appropriate internal controls, policies, and procedures concerning executive compensation, ethics, and compliance;

(d) Requiring that the Individual Defendants pay to the Company the amounts by which it has been damaged or will be damaged by reason of the conduct complained of herein;

(e) Awarding to Plaintiff costs and disbursements of the action, including reasonable attorneys' fees, consultants' and experts' fees, and expenses; and

(f) Granting such other and further relief as the Court deems just and proper.

## VIII.   <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated:  August 29, 2014

Respectfully submitted,

Mark Lebovitch
David Wales
Adam D. Hollander
BERNSTEIN LITOWITZ BERGER &
  GROSSMANN, LLP
1285 Avenue of the Americas
New York, N Y  10019
Telephone: (212) 554-1519

*Lead Counsel for Derivative Plaintiff*

/s/ Richard S. Wayne
Richard Wayne (0022390)
/s/ Robert R. Sparks
Robert R. Sparks (0073573)
STRAUSS TROY CO., LPA
The Federal Reserve Building
150 East Fourth Street
Cincinnati, OH  45202-4018
Telephone: (513) 629-9472
Facsimile: (513) 629-9426
E-mail: rswayne@strausstroy.com
E-mail: rrsparks@strausstroy.com

*Liaison Counsel for Derivative Plaintiff*

3775911_1.docx

35

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CITY OF PLANTATION POLICE OFFICERS' EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| JAMES B. BACHMANN, et al., | ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ABERCROMBIE & FITCH CO., | ) ) | |
| Nominal Defendant. | ) | |

**VERIFICATION OF JOHN MASTRIANNI IN SUPPORT**
**OF VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

John Mastrianni, being of full age, having been duly sworn according to law, upon his oath, deposes and says:

1.      I am the Board Chairman for the City of Plantation Police Officers' Employees' Retirement System (the "System"), plaintiff in the above captioned matter.

2.      As stated in the Verified Shareholder Derivative Complaint (the "Complaint"), the System is and has been at all times relevant to the action a shareholder of nominal defendant Abercrombie & Fitch Co.

3.      I have read the Complaint and consulted with counsel and the allegations therein are true based upon my personal knowledge, except for those matters set forth upon information and belief, in which case I believe them to be true.

4.    I hereby declare under penalty of perjury that the foregoing is true and correct.

                                          CITY OF PLANTATION POLICE OFFICERS'
                                          EMPLOYEES' RETIREMENT SYSTEM

                                          By:

                                              John Mastrianni
                                              Board Chairman

STATE OF FLORIDA          :
                          : SS
COUNTY OF BROWARD         :


        SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County
aforesaid, this 14 day of August, 2014.



                                          Notary Public

LINDA M. SULTZER
MY COMMISSION # EE 095865
EXPIRES: July 20, 2015
Bonded Thru Notary Public Underwriters

2