IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

The City of Plantation Police Officers'
Employees' Retirement System,                    Case No: 2:14-cv-1380

                    Plaintiff,                    Judge Graham

        v.

Michael S. Jeffries, et al.,

                    Defendants,

        and

Abercrombie & Fitch, Co.,

                    Nominal Defendant.


Opinion and Order Denying Motion For
Preliminary Approval of a Settlement in a Derivative Action

        This shareholder derivative action is before the court on plaintiff's motion for preliminary approval of a settlement among the parties. Because the court finds at this initial stage that plaintiff has not demonstrated that the proposed settlement provides fair consideration to absent shareholders in exchange for a broad release of claims, the motion for preliminary approval is DENIED.

## I.      Background

        Plaintiff is the City of Plantation Police Officers' Employees' Retirement System, a retirement plan that is treated as a citizen of Florida for purposes of diversity jurisdiction. Nominal defendant Abercrombie & Fitch Co., is a clothing retailer that is a Delaware corporation with its principal place of business in New Albany, Ohio. Defendant Michael Jeffries has served as Abercrombie's chief executive officer since 1992 and has served at various times as chairman, president, and director. The remaining defendants are members of Abercrombie's Board of Directors.

### A.      Alleged Wrongdoing

        The complaint alleges that since 2008 Abercrombie has been outperformed by its industry peer group by 369% and by the S&P 500 Apparel Retail Index by 321%. According to the

1

complaint, Abercrombie's performance has been "so deficient that, by the end of fiscal 2013, [Abercrombie] closed nearly 30% of its U.S. stores." Compl., ¶ 40.

> Moreover, during that time period, the Company's investors suffered through asset impairments and operating losses of over $500 million. [Abercrombie's] stock price has declined from a high of $82.06 per share on February 1, 2009 to a closing price of $35.38 on January 29, 2014, the day Plaintiff sent [Abercrombie] its initial Section 220 demand letter . . . .

Id.

The complaint portrays Abercrombie as a badly broken company in which: Jeffries received compensation vastly out of proportion with Abercrombie's declining performance; Jeffries' life partner, Matthew Smith, was "delegated managerial-like authority and access to key nonpublic [company] documents" despite not being an Abercrombie employee, Compl., ¶ 8; and Jeffries incurred "massive travel-related costs on the Company's dime," id., ¶ 10. The complaint alleges that the Board knew of each of these problems but failed to take corrective action, at least until after plaintiff made demands for an inspection of books and records under Section 220 of Delaware General Corporation Law.

As to the compensation issue, the complaint alleges that Jeffries has been paid over $140 million since 2008. The complaint alleges the company's performance was in the 14th percentile of its peer group for the three-year period ending January 31, 2012 but executive pay was in the 95th percentile. It further alleges that in 2013 Abercrombie had a 20% "say on pay" score (as measured by the percentage of shareholders in favor of proposed executive pay), the second worst such score among S&P 500 companies. The Board allegedly has repeatedly resisted calls by shareholders and independent advisory firms to align Jeffries' compensation with the company's performance. According to the complaint, the Board has failed to act on numerous opportunities to remedy the compensation problem, including most recently in December 2013 when Jeffries was awarded a new employment agreement under which the majority of Jeffries's $12 million compensation for fiscal year 2014 "would depend only on the unfettered discretion of the Board, and not on specific and objective performance goals." Compl., ¶ 66.

Turning to Smith, the complaint alleges that he is not an "employee or fiduciary, or otherwise accountable to the Board." Compl., ¶ 70. Smith "has at times been adverse to [Abercrombie], and in all instances has acted on behalf of Jeffries, not the Company." Id., ¶ 71. As an example, the complaint cites a deposition of Smith taken in a separate lawsuit in which he stated that he represented Jeffries in negotiating a compensation agreement with the company. Smith also allegedly heads The Jeffries Family Office, a personal family investment fund. According to the

complaint, since late 2007 Jeffries and the Board have provided Smith with access to proprietary documents and facilities and allowed him "to exercise key managerial functions concerning valuable real estate and store expansion strategies, all with no meaningful oversight." Id., ¶ 69. Smith allegedly has: participated in decisions identifying and selecting real estate locations for new store openings; played "a direct role" in determining "store opening and closings outside of the United States," id., ¶ 83; attended Board meetings during which the company's "finance[s], marketing, branding, and strategic planning" were discussed, id., ¶ 89; personally made 170 unannounced visits to Abercrombie stores around the world to report on their conformity with company policies and procedures; and kept "highly confidential" company information on The Jeffries Family Office's computer network, id., ¶ 79. The complaint alleges that a July 2014 interview with one of the defendant Board members revealed that he knew or should have known the extent to which Smith exerted control and had access at Abercrombie and that the Board member had earlier communicated his concerns to the company's general counsel, with no response.

With regard to business travel, the complaint alleges that Jeffries accumulated "significantly excessive" expenses by, for instance, staying in expensive hotel rooms and traveling unnecessarily by helicopter. Compl., ¶¶ 93-94. The complaint further alleges that Jeffries improperly used company resources for personal travel. The Board had knowledge of these matters, says the complaint, but tolerated Jeffries's alleged excesses.

The complaint asserts a single claim for breach of fiduciary duty against Jeffries and the Board members. The complaint alleges that defendants "are fiduciaries of the Company and its stockholders" and owe a duty of loyalty, due care, good faith fair dealing. Compl., ¶ 133. In addition to general fiduciary duties imposed by law, defendants allegedly owed specific fiduciary duties created by the company's governance documents. Defendants are alleged to have breached their fiduciary duties by failing to: align Jeffries's compensation with Abercrombie's performance; seriously consider shareholders' input regarding executive compensation; prevent Smith from having access to confidential information and exerting influence over management-level decisions; and restrict Jeffries's travel spending.

The complaint alleges that as a result of defendants' breaches of fiduciary duties, the company has sustained "significant" financial losses and damage to its corporate image and goodwill. Id., ¶ 136. The complaint demands relief in the form of an order requiring the company and defendants to take corrective measures to guard against further breaches and requiring

defendants to pay the company the amounts by which it has been damaged as a result of the alleged breaches.

### B.    Proposed Settlement

A compromise of this dispute was in motion well before the complaint was filed.   On January 29, 2014, counsel for plaintiff sent a Section 220 demand letter to the Board for inspection of the company's books and records to investigate potential breaches of fiduciary duty.   After a series of exchanges, the company ultimately "produced hundreds of responsive internal corporate documents for review, and confirmed that various publicly available documents . . . were accurate." Compl., ¶ 102.   Based on its review of these documents and on its own investigation, plaintiff determined that "it had a valid basis to bring a derivative action on behalf of the Company alleging that Defendants breached their fiduciary duties in connection with executive compensation and corporate governance failures."   Id., ¶ 103.

Plaintiff retained BHJ Partners LLC, a consulting firm in areas relating to corporate governance.   Together plaintiff and BHJ drafted a proposed set of governance reforms concerning executive compensation and presented them to the Board.   By mid-2014 the Board's Compensation Committee approved substantial changes to executive compensation that, according to the complaint, conformed to plaintiff's demands.   See Compl., ¶¶ 108-115.

Concurrent with its filing of the suit on August 29, 2014, plaintiff moved for the court to grant preliminary approval to a proposed settlement of this derivative action.   The settlement would memorialize changes to executive compensation that appear to have already made by the Board.   See Proposed Settlement, ¶ 34 (referring to some reforms as "already adopted").   It would also require reforms "in the areas of ethical and compliance management" and "internal controls."   Id.   The reforms are described as follows in plaintiff's motion for preliminary approval:

- a Board-appointed Chief Ethics and Compliance Officer who will report to the Board's Ethics and Compliance Committee and who "will be responsible for promoting good ethical behavior at the Company" and serve as a contact point for "all ethical and business conduct concerns and complaints";

- updated protocols for resolving conflicts of interest;

- an anti-corruption training program;

- tightened controls over third parties' access to proprietary company information; and

- reporting to general counsel and the Audit Committee of any use of company assets to "resolve or to avoid claims related to alleged personal misconduct by any senior executive."

Pl.'s Mot. for Prelim. Approval, p. 16.

Under the settlement, the company would pay counsel for derivative plaintiff $2,775,000 in attorneys' fees and expenses. No other monetary payments, either to the company or to shareholders, are provided for in the proposed settlement.

In exchange for these corporate reforms and payment of plaintiff's attorneys' fees, all shareholders of Abercrombie would release all claims and causes of action that they have against Abercrombie, current and former members of the Board and current and former executive officers for conduct relating in any way to the allegations, transactions or occurrences set forth in the Section 220 Demand or the company's response to the Section 220 Demand. "For the avoidance of doubt, the Released Plaintiff's Claims include breach of fiduciary duty claims, discussed in the Section 220 Demand or raised in the Verified Stockholder Derivative Complaint, related to executive compensation awards and alleged governance and oversight failures . . . ." Proposed Settlement, ¶ 33(o).

## II. Legal Standard

Under Federal Rule of Civil Procedure 23.1, derivative actions "may be settled, voluntarily dismissed, or compromised only with the court's approval. Notice of a proposed settlement, voluntary dismissal, or compromise must be given to shareholders or members in the manner that the court orders." Fed. R. Civ. P. 23.1(c).

Court approval of derivative actions often follows a two-step process: (1) preliminary approval and (2) notice followed by a fairness hearing. See In re Telectronics Pacing Sys., Inc., 137 F.Supp.2d 985, 1015-16 (S.D. Ohio 2001); see also 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1839 (3d ed. 2007). "'If the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval, then the Court should direct that notice be given to the class members of a formal fairness hearing, at which evidence may be presented in support of and in opposition to the settlement.'" Telectronics., 137 F.Supp.2d at 1015-16 (quoting Manual for Complex Litig. § 30.44 (2d ed. 1985)).

At the preliminary approval stage, the district court must undertake a careful review of a proposed settlement and ensure that absent shareholders will be treated fairly. See Staton v. Boeing

<u>Co.</u>, 327 F.3d 938, 959-60 (9th Cir. 2003).  The court should not act as a rubber stamp and should not rely solely on the opinion of the attorneys before it when evaluating a proposed settlement.  <u>See</u> Wright & Miller, *supra*, § 1839 n. 32 (citing cases).  At the same time, the court should refrain from overreaching and substituting its own opinion of an optimum bargain if the proposed settlement falls within a permissible range of what a fair negotiation process would produce.  <u>See</u> <u>Telectronics</u>, 137 F.Supp.2d at 1015-16; <u>United Founders Life Ins. Co. v. Consumers Nat'l Life Ins. Co.</u>, 447 F.2d 647, 655 (7th Cir. 1971).

## III.  Discussion

After reviewing the materials submitted by the parties and conducting a conference with counsel, the court is unable to conclude that the proposed settlement treats absent shareholders fairly.  The court's fundamental concern is that, given the seriousness of the allegations in the verified complaint (which the court presumes has some basis in fact), the proposed settlement broadly releases shareholders' claims for little, if any, consideration and provides no monetary compensation to the company.  The purported benefit comes as a package of corporate reforms that appear to largely fall into two categories: those having been already adopted and those lacking in definiteness (promoting "good ethical behavior" and conducting "anti-corruption" training).  The parties have not provided the court or shareholders with the information needed to evaluate how much harm defendants' wrongdoing caused to the company and shareholders or to evaluate how much value the corporate reforms have.

The complaint describes wrongdoing of a serious magnitude – of a CEO who was vastly overcompensated and misused corporate resources, particularly during his frequent travels; of a CEO and Board who gave a non-employee access to confidential information and allowed him to influence, if not single-handedly make, strategic decisions that turned out poorly, particularly regarding expansion into overseas markets, an aspect of Abercrombie's business that the complaint states is "crucial" to the company's business, Compl., ¶ 73; and of a Board that ignored shareholder concerns and either acquiesced in or endorsed the misconduct of Jeffries and Smith.  According to the complaint, Abercrombie performed so deficiently relative to its peers that it closed 30% of its U.S. stores, suffered asset impairments and operating losses of over $500 million and saw share prices decline by nearly $47.  Considering that the company has over 71 million shares currently outstanding, <u>see</u> S.E.C. Form 10-Q filed by Abercrombie & Fitch Co. on Sept. 5, 2014, the court observes that the total loss to shareholders may have been billions of dollars.

It may be that the alleged wrongdoing did not cause the entire loss to share value described in the complaint. Nevertheless, the complaint alleges that the wrongdoing harmed both the company and its shareholders and it characterizes the financial harm as "significant." Compl., ¶¶ 134, 136. The court is therefore troubled that counsel have not conducted a valuation of the possible damages to the company and shareholders that is attributable to the conduct and occurrences identified in the complaint. See Tr. of Sept. 8, 2014 Conf., pp. 5-6. Counsel point out that plaintiff retained a corporate governance expert to assist in proposing executive compensation reforms, but BHJ's expertise extended only to recommending changes to corporate policy and not to evaluating the damage done. BHJ's report does not assign a monetary value to the claims being released. See BHJ Report, p. 24 (stating in a general sense that the alleged wrongdoing caused "material financial costs to the firm").

Nor have the parties attempted to quantify the value of the corporate reforms set forth in the proposed settlement. When some of the reforms are so indefinite as promises to "consider exploring and evaluating appropriate mechanisms to measure the Company's social and governance behaviors" and to "consider enhancing the manner and frequency in which feedback is solicited from employees," see Proposed Settlement, Ex. A., p. 5, valuation may be a difficult task. But even as to the concrete reforms to executive compensation, BHJ opined only that they would bring about "substantial" immediate and long term value. See BHJ Report, p. 24.

In a conference with the court, plaintiff's counsel stated that "this is really a case for corporate therapeutics and a change in the corporate governance. It's not a situation where we filed a case to get money back to the shareholders for the losses." Tr. of Sept. 8, 2014 Conf., pp. 7-8. While such an aim is appropriate in a derivative action, it is puzzling why the stated purpose of the case does not match up with the scope of the settlement's broad release of shareholders' claims. Shareholders are being asked to release not only derivative claims, but all causes of action they may have against Abercrombie, Jeffries and past and present Board members and executive officers that relate "in any way" to the matters set forth in the Section 220 Demand, which encompasses all of the allegations made in the complaint. See Pl.'s Mot. for Prelim. Approval, Exs. B & C.

When the court inquired about the effect the proposed settlement would have on shareholders' claims for damages, counsel for plaintiff asserted that shareholders would still be able assert a Section 10b-5 claim for securities fraud against defendants. See Tr. of Sept. 8, 2014 Conf., p. 8. This interpretation of the proposed settlement's broad, "relate to in any way" release is debatable. More importantly, Section 10b-5, which is directed at fraud in connection with the sale

of securities, is likely not the most useful tool available to shareholders to remedy the wrongdoing that allegedly took place at Abercrombie. See 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. The actionable conduct identified in the complaint best fits a breach of fiduciary claim – a claim that the release clearly waives. See Proposed Settlement, ¶ 33(o) ("For the avoidance of doubt, the Released Plaintiff's Claims include breach of fiduciary duty claims . . . .").

The release of shareholder claims for breach of fiduciary duty would not amount to much of a sacrifice were the governing law one providing that officers and directors owe fiduciary duties only to the corporation and not to shareholders. See, e.g., Bank of Am. Corp. v. Lemgruber, 385 F.Supp.2d 200, 224 (S.D.N.Y. 2005). However, Delaware, the state of incorporation of Abercrombie, recognizes a direct cause of action by shareholders against officers and directors for breach of fiduciary duty. Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (setting forth a two-part test for whether a stockholder's claim is derivative or direct is: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"). The complaint itself alleges that defendants owed fiduciary duties to both Abercrombie and shareholders. Compl., ¶ 120.

The allegations of the complaint and the potential availability of a direct claim for breach of fiduciary duty under Delaware law strongly suggest the need for an independent evaluation of the value of what shareholders would be required to give up under the proposed settlement. One might argue that the absence of litigation by other shareholders indicates that such a claim has little value. See Tr. of Sept. 8, 2014 Conf., p. 5. That argument is only as good as the extent to which other shareholders have knowledge of the alleged wrongdoing. Counsel have directed the court's attention to sources showing that the matter of Jeffries' compensation has been known to the investing public. See S.E.C. Form 8-K filed by Abercrombie & Fitch Co. on Apr. 7, 2014; Engaged Capital's Dec. 3, 2013 Letter to the Board of Directors of Abercrombie & Fitch Co. However, it is not so clear that the remainder of the allegations of the complaint, particularly those regarding Smith and the Board's knowledge of Smith's involvement in corporate affairs, has been known to the public.

The complaint refers to an age discrimination suit filed in 2010 against Abercrombie by a former pilot of the corporate jet. See Bustin v. Abercrombie & Fitch Co., No. 2:10-cv-1675 (E.D. Pa.). According to the complaint, a flight manual produced during discovery in the Bustin case revealed that Smith received Abercrombie sales reports while traveling on the jet and that those sales

reports were stored on the computer network of The Jeffries Family Office. The complaint further alleges that during a deposition in the <u>Bustin</u> litigation, Smith testified that he advised Jeffries regarding "goings-on at the Company" and helped negotiate Jeffries's compensation. Compl., ¶ 72. The complaint further refers to a May 22, 2013 article posted online by BuzzFeed. The article allegedly stated that Smith played a role in expansion plans but that "'it's unclear if Smith is just relaying information to Jeffries and then carrying out his wishes . . . or if he's acting as an executive in his own right.'" Compl., ¶ 85 (quoting BuzzFeed article).

The court is unable to determine whether the investing public knew of, or at least fully appreciated, the information allegedly revealed during the <u>Bustin</u> litigation and by the BuzzFeed article. The court's own research of publicly-available sources indicates that media reports of the <u>Bustin</u> litigation largely ignored information regarding Smith in favor of other, more headline-grabbing details that discovery uncovered. <u>See</u>, <u>e.g.</u>, Sapna Maheshwari, *Models on Abercrombie Jet Had Rules on Proper Underwear*, Bloomberg.com, Oct. 18, 2012; Shan Li, *For Abercrombie CEO, No Detail on Jet is Too Small*, L.A. Times, Oct. 23, 2012, 2012 WLNR 22460844; Nikhil Kumar, *The New Howard Hughes? Michael Jeffries, Abercrombie & Fitch 'Chief Eccentric Officer', dictates what underwear and flip-flops staff should wear . . .*, Independent Online, Oct. 23, 2012, 2012 WLNR 22616283. And it is unclear to the court how the investing public received the BuzzFeed article, whether the matters reported in the article carried much credibility. <u>See</u> Compl., ¶ 88 (alleging that one Board member stated that he was unaware of the BuzzFeed article); Alyson Shontell, *"I Love Cute, Fluffy Animals": A Q&A With BuzzFeed Editor-In-Chief Ben Smith*, Business Insider, Dec. 10, 2012, 2012 WLNR 26270383 (discussing BuzzFeed's effort to add "credible news" to its viral- and entertainment-based content). Thus it would seem possible that the information identified in the complaint as being publicly-available may have been obscured by the tabloid-type reports swirling around Jeffries.

In any event, the complaint makes additional allegations – beyond what was disclosed by the <u>Bustin</u> litigation and the BuzzFeed article – that would buttress a claim for breach of fiduciary duty. Shareholders perhaps have not been apprised of these allegations, which are based on the company's response to the Section 220 Demand and a July 31, 2014 interview with a Board member. For instance, the BuzzFeed article did not attempt to resolve whether Smith simply carried out Jeffries's commands or if he acted as an executive. The complaint's allegations support an inference that Smith did the latter. It alleges that he attended Board meetings, executed an agreement with the company giving him access to proprietary documents and facilities, provided direct input on selecting locations for expansion, conducted meetings with the company's vice president of real

estate, and bypassed the company's internal audit program by personally visiting retail stores and evaluating them for compliance with company policies. Moreover, the complaint alleges that the Board knew or had reason to know of Smith's influence at the company, and it cites the July 31, 2014 interview in alleging that one Board member took his concerns to the company's general counsel but did not receive any response.

Thus, the lack of direct litigation by shareholders does not convince the court that shareholders have already examined the matters alleged in the complaint and found them not worth pursuing.

Courts have expressed concern that settlements in class and derivative actions can be vehicles for collusion "that primarily serve the interests of defendants—by granting expansive protection from law suits—and of plaintiffs' counsel—by generating large fees gladly paid by defendants as a quid pro quo for finally disposing of many troublesome claims." In re General Motors Corp. Pick-Up Truck Fuel Tank Products, 55 F.3d 768, 778 (3d Cir. 1995); see also John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions*, 86 Colum. L. Rev. 669, 714-20 (1986). This problem has been described as one of "mutual indulgence." See Kaplan v. Rand, 192 F.3d 60, 67 (2d Cir. 1999); Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1310 (3d Cir. 1993) ("The parties can be expected to spotlight the proposal's strengths and slight its defects.").

Collusive settlements "usually come as a cash award to counsel, a broad release of claims, and a cosmetic non-cash recovery for the absent shareholders." In re Zoran Corp. Derivative Litig., No. 06-5503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008). Here, plaintiff filed suit and simultaneously presented the court with a pre-arranged settlement featuring a $2,775,000 payment to counsel, a release that appears to be overbroad, no cash recovery for the company or shareholders and corporate reforms that seem to be in large part either already adopted or indefinite. See id., 2008 WL 941897, at *1 ("[I]ndeed, some of the supposed consideration is not consideration at all, but merely a concession made by certain defendants *before* the operative complaint was even filed.") (emphasis in the original)

The court is not branding this proposed settlement as collusive. Nevertheless, the court's concerns about the fairness of the proposed settlement, which were first raised in a conference with counsel, were not dispelled by supplemental briefing.

The court therefore finds at this preliminary stage that the proposed settlement cannot be approved. The court hereby requires the parties to serve current Abercrombie shareholders with a

copy of this opinion and order so that shareholders may consider the matters alleged in the complaint, consider the effect of a settlement of the derivative action upon their rights, and consider whether to seek to intervene in this action under Rule 24 of the Federal Rules of Civil Procedure. In notifying the shareholders of this opinion and order, the parties shall follow the procedure that they had proposed to follow in notifying shareholders of the preliminary settlement, see Pl.'s Mot. for Prelim. Approval, p. 25, and shall do so within ten business days of this order.

Within three business days of the date of this order, the parties shall submit for the court's approval a proposed cover notice that will accompany the mailing sent to shareholders. The cover notice shall include the caption of the case and be entitled "Notice of Opinion and Order Denying Motion For Preliminary Approval of a Settlement in a Derivative Action." The cover notice will state that: the court (and not an attorney) authorized the notice, the notice is to all shareholders of Abercrombie common stock as of August 29, 2014, the matter relates to a stockholder derivative action in the United States District Court for the Southern District of Ohio, and the legal proceedings will affect their legal rights.

The court will consider appointment of an independent expert to evaluate the potential claims for breach of fiduciary duty and invites suggestions from counsel regarding a procedure for selecting an expert.

## IV. Conclusion

For the reasons stated above, the motion for preliminary approval of the proposed derivative litigation settlement (doc. 2) is DENIED.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: September 26, 2014