**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| THE CITY OF PLANTATION POLICE OFFICERS' EMPLOYEES' RETIREMENT SYSTEM, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:14-cv-1380 |
| | ) | (James L. Graham, Judge) |
| v. | ) | (Norah McCann King, Mag. Judge) |
| | ) | |
| MICHAEL S. JEFFRIES, et al., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ABERCROMBIE & FITCH CO., | ) | |
| | ) | |
| Nominal Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
FINAL APPROVAL OF DERIVATIVE LITIGATION SETTLEMENT AND AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES**

**CONTENTS**                                                                    **PAGE**

I.      INTRODUCTION ..................................................................................... 1

II.    PROCEDURAL AND FACTUAL BACKGROUND....................................... 6

     A.    The System's Investigation and Demand to Inspect A&F's Books and Records ...............................................................................................6

     B.    The System Retains Corporate Governance Experts and Demands Extensive Governance Enhancements that the Company Implements...................................10

     C.    Ongoing Settlement Negotiations .....................................................13

III.   THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL ............................... 16

     A.    The Final Approval Standard................................................................16

     B.    The Settlement Provides Significant Benefits to A&F and its Shareholders.........18

     C.    The Settlement is Not the Product of Fraud or Collusion.....................................23

     D.    The Complexity, Expense and Likely Duration of the Litigation Favor Final Approval .............................................................................................24

     E.    Plaintiff Has Engaged in Extensive, and Focused, Discovery..............................25

     F.    The Likelihood of Success on the Merits Favors Final Approval ........................26

     G.    Plaintiff and its Counsel Support the Settlement ...................................................27

     H.    The Reaction of Absent Shareholders Favors Final Approval .............................29

     I.    The Settlement is in the Public Interest .................................................................30

IV.   THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED ........... 31

     A.    Legal Standard Governing Fee Applications.........................................................32

     B.    Application of the Legal Standard Supports Approval of the Requested Fee Award.......................................................................................................................33

V.    CONCLUSION....................................................................................... 39

Plaintiff City of Plantation Police Officers' Employees' Retirement System ("the System" or "Plaintiff"), by and through its undersigned counsel, respectfully submits this memorandum of law in support of its Motion for Final Approval of the Derivative Litigation Settlement, which this Court preliminarily approved on October 10, 2014 (ECF. No. 19), and for approval of attorneys' fees and reimbursement of expenses.[1]

## I.     INTRODUCTION

The proposed settlement of this shareholder derivative lawsuit (the "Settlement"), filed on behalf and for the benefit of Abercrombie & Fitch Co. ("A&F" or the "Company"), provides both A&F and its public stockholders with broader benefits, immediately and for the long term, than they could realistically have achieved through a post-trial judgment several years from now. Moreover, the benefits attainable solely through this Settlement compare very favorably to the terms of any governance-based settlement of which Plaintiff and its counsel are aware.

As set forth below and in the final report by Plaintiff's outside financial and corporate governance experts,[2] the drastic overhaul to A&F's executive compensation practices embodied in the Settlement, had they been in place in the past several years, would have saved A&F as much as **_$62 million_** in executive compensation expense, and (the System hopes) the better alignment of compensation with Company performance will help achieve better earnings for A&F over the next several years.  Moreover, the ethics, governance and compliance structures

---

[1] Defendants are: Michael S. Jeffries ("Jeffries"), James B. Bachmann ("Bachmann"), Bonnie R. Brooks ("Brooks"), Terry L. Burman ("Burman"), Sarah M. Gallagher ("Gallagher"), Michael E. Greenlees ("Greenlees"), Archie M. Griffin ("Griffin"), Arthur C. Martinez ("Martinez"), Diane L. Neal ("Neal"), Charles R. Perrin ("Perrin"), Stephanie M. Shern ("Shern"), and Craig R. Stapleton ("Stapleton").  All citations to "¶__" are to paragraphs of the Verified Stockholder Derivative Complaint (the "Complaint") (ECF No. 1).  Unless otherwise noted, all capitalized terms retain the definitions assigned in the Complaint and the Memorandum of Law in Support of Plaintiff's Motion for Preliminary Approval of Derivative Litigation Settlement (ECF No. 2).

[2] _See_ Declaration of Mark Lebovitch in Support of Final Approval of Derivative Settlement ("Lebovitch Decl.") Exhibit ("Ex.") D (BHJ Partners LLC, Shareholder Value Analysis Report of Compensation and Governance Remediation at Abercrombie &Fitch" (Nov. 28, 2014)).

and enhancements that the A&F Board will adopt only if the Court grants final approval of the Settlement will leave A&F at the top of industry practices, improve performance at A&F, and help A&F avoid or minimize regulatory scrutiny and costs.  Put simply, the Settlement is very valuable and should be approved.

The Settlement was achieved following Plaintiff's extensive investigation, through which Plaintiff concluded that A&F suffered harm due to significant breaches of duty by the members of the Company's board of directors (the "Board").  Specifically, between 2008 and early-2014, the Company's Board authorized its Chief Executive Officer ("CEO") and Chairman,[3] Defendant Michael Jeffries, to receive over $140 million in total compensation despite consistent underperformance, drawing ire from A&F shareholders and stockholder advisory firms Glass Lewis and Institutional Shareholder Services ("ISS").  Further, Plaintiff concluded that the Board knew or should have known that Jeffries had improperly delegated a managerial-like role and access to key nonpublic A&F documents to his life partner, Matthew Smith ("Smith"), who owed no duties of loyalty or care to the Company or its public stockholders.  Moreover, for years, the Board did not take sufficient steps to monitor corporate expenses, ensure appropriate controls over how executives and non-executives conducted themselves in connection with Company business, or implement sufficient internal controls relating to expenses, ethics, and compliance issues.

After Plaintiff initiated a Demand under Section 220 ("Section 220") of the Delaware General Corporation Law ("DGCL")to inspect A&F's books and records (the "Section 220 Demand") as part of its investigation into potential breaches of fiduciary duty, and after

---

[3] Jeffries served as the Company's CEO and Chairman from the time ANF went public in 1996 until January 28, 2014, when ANF announced that it had split the Chairman and CEO roles.  Jeffries continues to serve as ANF's CEO, while Defendant Martinez now serves as the Company's nonexecutive chairman.

Defendants produced documents in response to the Section 220 Demand, the parties engaged in settlement discussions. Plaintiff had already retained qualified corporate governance experts, who worked closely with Plaintiff to objectively identify and assess the root causes of A&F's governance shortcomings. Once settlement discussions began, those experts helped to craft proposals for enhancements reflecting best practices while also being specifically tailored to the A&F-specific issues and concerns that Plaintiff's investigation raised.

By its nature, filing this derivative suit could not and would not seek any direct award of damages to be paid to A&F's stockholders. While A&F's stock performance has been poor for quite some time, the suit could not and would not seek to compensate investors directly for those stock price declines. Rather, this derivative suit, if filed, would seek only to remedy the harm to the Company itself caused by the Board's lackadaisical performance and Jeffries's improper conduct. Moreover, while squandering needless expenses and providing access to non-employees are both improper, the total potential damage award for such misconduct was likely not material as compared with A&F's overall expenses. And while Jeffries's compensation was a large dollar value, it remained modest compared with the size of A&F's business, and any claim for disgorgement of compensation would have to recognize that Jeffries would be entitled to some (and perhaps a significant) portion of his compensation. Such claims challenging compensation as being "too much," but not in violation of a valid employment agreement, have a low track record of success.

Thus, while Plaintiff uncovered wrongdoing and believed it could allege viable claims for breach of duty, Plaintiff understood the limits of the derivative suit it believed it could pursue. Plaintiff also recognized that Jeffries is not leaving the Company anytime soon, and that the need for meaningful Board oversight of ethics and compliance would persist. Accordingly, Plaintiff

made the reasonable judgment that A&F and its public stockholders would enjoy greater benefits from a settlement implementing immediate structures, practices, and policies to enhance A&F's governance and compensation on a going-forward basis than if Plaintiff simply filed suit and pursued an uncertain future damage payment to the Company itself.

While Plaintiff's counsel made clear their and the System's willingness to battle Defendants through extensive and hard-fought litigation, Plaintiff's counsel also suggested that Defendants could do a better service for the Company by engaging in good faith with Plaintiff to structure a negotiated resolution that would enhance governance and increase future value for A&F and its stockholders.  As a result, after a series of detailed negotiations, the Board agreed to implement the terms of the Settlement, which reflects substantially all of Plaintiff's recommendations developed in conjunction with BHJ.

As a result of the Settlement, A&F is already positioned to benefit by tens of millions of dollars saved in future executive compensation.  A&F has enhanced its executive compensation practices such that, had those reforms been in place dating back to 2008, and had A&F's performance stayed the same, the Company would have saved approximately ***$62 million*** in compensation costs between 2011 and 2013 alone.[4]  Moreover, by better aligning incentives for compensation with results for A&F and its stockholders, the compensation reforms better position A&F to enjoy improved performance in the form of increased earnings.

If the Court grants final approval of the Settlement, A&F and its shareholders will also realize significant – even if not immediately quantifiable – value from the implementation of better ethics and compliance controls and processes.  As set forth in more detail below and in BHJ's report, significant governance enhancements like the appointment of a Chief Ethics and

---

[4] Lebovitch Decl. Ex.D at 2, 6, 20.

Compliance Officer ("CECO") and the implementation of a new Anti-Corruption Compliance Training Program will directly add value and benefit the Company and its shareholders by ensuring, among other things, greater internal controls over ethics and compliance, as well as tighter controls over third parties' access to nonpublic A&F information.[5]  As further detailed in BHJ's accompanying report, there is a strong basis to conclude that improved internal controls will enable the Company to achieve "significant outperformance" relative to the broader stock market.[6]  Further, enhanced monitoring will enable the Company to effectively limit future lawsuits and regulatory actions that would impose great expense on A&F arising from ethics and compliance failures, and the Company will further have the ability to recoup any such costs from the responsible bad actors.[7]

To be sure, the agreed-upon enhancements compare favorably to any settlement in the area of derivative litigation, will leave A&F one of the country's leading companies in many important areas of corporate governance, and will achieve specific relief that may not have been readily available if the case went all the way to trial.

As discussed below, courts, including the Sixth Circuit and district courts within the Circuit, have repeatedly recognized that settlements providing for meaningful governance enhancements – even when not accompanied by a monetary component – are "genuinely beneficial" to companies and their shareholders, provide value, and play a key role in preventing future harm.  *See, e.g.*, *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1206-07 (6th Cir. 1992) (recognizing governance-only settlement as "genuinely beneficial" and awarding fees where settlement consisted of appointment of three independent directors and special board

---

[5]  *Id.* at 13.

[6]  *Id.*

[7]  *Id*.

committee to monitor controlling director). Here, the agreed-upon reforms are at least as comprehensive and valuable as any benefits that could be achieved at trial, and the Settlement will allow A&F and its shareholders to realize that value certainly and immediately. And, the Settlement does nothing to impair any A&F stockholder who believes it has individual claims that can be brought on a direct basis from pursuing such claims. Accordingly, and as set forth herein, final approval of the Settlement and Plaintiff's counsel's requested fee award is appropriate.

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. The System's Investigation and Demand to Inspect A&F's Books and Records

Beginning in late 2013 and continuing in early 2014, the System, by and through its counsel, engaged in an extensive investigation of A&F about the Board's purported inattentiveness and elevation of the interests of its CEO, Jeffries, at the expense of the Company's public investors.[8] The System's counsel reviewed all of A&F's public filings with the Securities and Exchange Commission ("SEC") since 2008, including quarterly and annual reports, proxy statements in advance of each year's annual stockholder meeting, and other filings.[9] The System's counsel reviewed other publicly available information, including media reports, analyst reports and proxy advisor reports regarding A&F's business, financial performance, and corporate governance.[10] Those public filings and materials provided the foundation for potential derivative claims concerning Jeffries's and other executives' compensation, the composition and functions of the Board, stockholder outreach and opinion, and the Company's reaction concerning various developments involving senior executives.

---

[8] Lebovitch Decl. ¶4.

[9] *Id.* at ¶5.

[10] *Id.*

Plaintiff's counsel also reviewed numerous public documents, including court filings in multiple litigations involving A&F.[11]  Pleadings, briefing, and other filings – including internal A&F documents attached as exhibits to those filings – shed considerable light on potential executive-level misconduct at the Company and the current state of internal controls over legal and ethical compliance.  For instance, filings in *Bustin v. Abercrombie & Fitch Co.*, Case No. 10-cv-01675 (E.D. Pa.), including key deposition testimony and the A&F flight crew manual, provided Plaintiff a basis to investigate whether Jeffries had provided his companion, Matthew Smith, with access to nonpublic A&F sales reports at the time Smith represented Jeffries in contract negotiations where he was adverse to the Company, and whether Smith otherwise played a decision-making role at the Company.[12]

Moreover, filings in *The Booth Family Trust v. Jeffries*, Case No. 2:05-cv-0860 (EAD)(TPK)(S.D. Ohio) included detailed allegations of significant ethical and compliance failures at A&F.[13]  Information gleaned from reviewing filings in those matters was helpful in shaping Plaintiff's investigation moving forward.[14]  Plaintiff's counsel also reviewed numerous public news articles and reports detailing Jeffries's conduct, Smith's role at the Company, and stockholder objections to Jeffries's compensation.[15]

Plaintiff's counsel further worked to gain an understanding of the Company's stockholder outreach activities, its responsiveness (or lack thereof) to stockholder concerns, and its prior willingness to meaningfully address underlying compensation and governance problems.[16]  This

---

[11] *Id.* at ¶6.

[12] *Id.*

[13] *Id.* at ¶7.

[14] *Id.*

[15] *Id.* at ¶¶7-8.

[16] *Id.* at ¶8.

thorough foundational investigation put Plaintiff in position to issue narrow, targeted demands for books and records of the Company that would either vindicate the Board or would substantiate the System's concerns and provide the basis for a derivative action alleging breaches of fiduciary duty.

On January 29, 2014, Plaintiff sent a letter under DGCL Section 220 to the A&F Board and Corporate Secretary, demanding inspection of the Company's books and records in order to investigate potential breaches of fiduciary duty by the Board.[17]  Plaintiff supplemented its initial letter on February 28, 2014.[18]  Pursuing such a demand for investigation, rather than initiating litigation without first using the "tools at hand," has been strongly encouraged by the Delaware Supreme Court.  *See, e.g.*, *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 120 (Del. 2006) (discussing the court's "encouragement of stockholders, who can show a proper purpose, to use the 'tools at hand' to obtain the necessary information before filing a derivative action.  Section 220 is now recognized as an important part of the corporate governance landscape.") (internal quotation marks omitted).

In the Section 220 Demand, the System expressed its concern that the Board had breached its fiduciary duties by granting the Company's CEO, Defendant Jeffries ("Jeffries"), compensation that bore no relationship to the Company's financial performance in recent years.[19]  Specifically, Jeffries was eligible to receive over $140 million in compensation since 2008, despite the Company performing so poorly – relative to its industry peers and on an absolute basis – that it suffered over $500 million in asset impairments and operating losses over that time

---

[17]  *Id*. Ex. B (1/29/14 M. Lebovitch Ltr. to A&F Board).

[18]  *Id*. Ex. C (2/28/14 M. Lebovitch Ltr. to ANF Board).

[19]  *Id.* Ex. B at 2.

period and was forced to close 30% of its U.S. stores in 2013 alone.[20]  The System also expressed its concern that the Board had disregarded that A&F repeatedly failed stockholder say-on-pay votes, with as little as 20% approval (second worst in the S&P 500), and stockholder advisory firms ISS and Glass Lewis gave the Company failing grades, yet the Board still failed to alter Jeffries's compensation so as to bring it in line with A&F's performance.[21]  The System also expressed concerns about the other perks and benefits that the Board granted to Jeffries.[22]

Finally, the System expressed its concerns, based on the investigation of counsel, that the Board had allowed Jeffries to delegate managerial-like authority over certain strategic decisions to Jeffries's life partner Smith, including providing Smith with access to confidential A&F information.[23]  Smith has never been an A&F employee, director, or officer, or otherwise owed any duties to the Company.

The Board responded on or about February 10, 2014, raising various objections to the January 29 letter and certain other defenses, but also stating that it would consider producing certain responsive documents.[24]  Plaintiff and its counsel did not credit those objections, and Plaintiff pressed for broad production of the responsive records.[25]

From the outset, Plaintiff and its counsel expected and were prepared for drawn out, hard-fought litigation.  The System and its counsel were prepared to devote considerable human and financial resources to the litigation, and to run the risk – particularly in light of the protections that Delaware law affords corporate directors – that such long, costly litigation might ultimately

---

[20] *Id.*

[21] *Id.* at 2-3.

[22] *Id.* Ex. C at 2.

[23] *Id.* at 2-3; *Id.* Ex. B at 3-4.

[24] Lebovitch Decl.¶12.

[25] *Id.*

prove unsuccessful despite their perceived merit.[26]  Plaintiff and its counsel understood that, at best, any benefits to the Company and to Plaintiff might take years to achieve.

Over time, however, and because Plaintiff aggressively pursued its Section 220 Demand, Defendants produced thousands of pages of documents for the System's review, including: minutes of meetings of the Board and its Audit and Compensation Committees and related documents, including presentations by the Company's compensation advisors; documents reflecting the negotiation of Jeffries's current employment agreement; Jeffries's expense reports; and documents reflecting Smith's access to nonpublic information and role at the Company.[27] The documents produced substantiated many of the System's pre-existing concerns developed throughout the course of the System's and its counsel's prior investigation.

### B.  The System Retains Corporate Governance Experts and Demands Extensive Governance Enhancements that the Company Implements

After receiving the documents from A&F, the System also retained qualified corporate governance experts at BHJ to assist in the anticipated litigation.[28]  BHJ worked closely with Plaintiff, throughout its investigation and negotiations with the Board, to objectively identify and assess the root causes of A&F's governance shortcomings and, once settlement discussions began, to craft proposals for enhancements that reflect best practices while also being specifically tailored to the A&F-specific issues and concerns that Plaintiff's investigation raised.

The compensation and other enhancements that the Board has agreed to in the Settlement reflect, to a large extent, the specific input of Messrs. Jarrett and Hodgson.  Hodgson, who primarily focused on compensation-related issues, is widely considered one of the foremost authorities on executive compensation, with more than 20 years' experience advising companies,

---

[26] *Id.* ¶14.

[27] *Id.* ¶15.

[28] *Id.* ¶¶16-17.

writing articles and other texts on executive compensation issues, and providing analysis to the markets. Jarrett, who primarily focused on the governance, ethics, and compliance issues, likewise has more than 20 years' experience advising companies, speaking, and publishing his work, with particular emphasis on ethics and best-quality governance processes in public companies.[29]

After reviewing A&F's initial document production, Plaintiff's counsel contacted A&F's counsel.[30] Plaintiff's counsel expressed their view that the documents supported viable derivative claims of breaches of fiduciary duty by A&F's Board members, including Jeffries, as well as Plaintiff's view that immediate and comprehensive governance enhancements would provide greater value to A&F stockholders than would a post-trial judgment following years of litigation.[31] Plaintiff later made a settlement demand.[32]

BHJ worked closely with Plaintiff, throughout its investigation and subsequent negotiations with the Board, to objectively identify and assess the root causes of ANF's governance shortcomings.[33] Once settlement discussions began, BHJ crafted proposals for governance and compliance enhancements reflecting best practices, while also being specifically tailored to the ANF-specific issues and concerns that Plaintiff's investigation raised.[34]

Based on BHJ's input, on March 18, 2014, the System's attorneys sent the A&F Board a preliminary set of ethical and compliance management, internal controls, and executive

---

[29] *See generally id.* Ex. D at 17-19.

[30] *Id.* ¶18.

[31] *Id.*

[32] *Id.* ¶¶19-20.

[33] *Id.* ¶17.

[34] *Id.* ¶¶17, 20.

compensation proposals.[35]  Although the System preferred to see A&F adopt and implement improved governance at the earliest date, there could still be no assurance that the A&F Board had genuinely decided to correct problems at the Company.  Accordingly, parallel to settlement negotiations, Plaintiff's counsel continued to prepare for litigation.[36]

The members of the A&F Board took Plaintiff's proposals seriously.  On April 7, 2014, the Company filed a Form 8-K with the Securities and Exchange Commission stating that, on March 31, 2014, the Board had made a number of significant changes to the Company's executive compensation structure.[37]  According to A&F, those changes "***reflect[ed] extensive input from stockholders of the Company***."[38]  Privately, the Company indicated to Plaintiff its willingness to engage in further negotiations with the System regarding potential governance enhancements as part of a broader settlement of the asserted claims.[39]

The Board recognizes the value that the System's compensation-related proposals have to the Company and its stockholders.  Specifically, during a July 15, 2014 due diligence interview in this matter, Compensation Committee chair Greenlees confirmed that the changes announced in the April 7, 2014 Form 8-K reflect the System's input, and that the System's engagement was helpful because it pushed A&F to develop a compensation program that enhanced accountability and better aligned compensation with A&F's performance.  Similarly, in a July 31, 2014 due

---

[35] *Id.* ¶20.

[36] *Id.*

[37] *Id.* ¶24; Ex. E (A&F Apr. 7, 2014 Form 8-K (emphasis added)).

[38] *Id.*

[39] *Id* ¶24.

diligence interview, Audit Committee chair Bachmann stated that the System's input has helped the Company move closer to best practices in terms of governance, ethics and compliance.[40]

The BHJ corporate governance experts have also described concrete benefits to the Company and its stockholders from A&F's compensation-related enhancements. Specifically, assuming no other change to A&F's historic performance, "[h]ad the reforms been in place [since 2008], shareholders would have saved more than *$62 million* in equity-based compensation expense."[41] Further, the examples discussed in BHJ's report of recent compensation reforms at Home Depot and Nordstrom suggest that A&F's compensation reforms may well pave the way for significantly improved performance moving forward.[42] Thus, while nobody can predict how A&F will perform in the future, it is safe to say that the Company's performance will either improve, thus benefitting the Company's public stockholders, or it will not improve, and its executive compensation will decline by tens of millions of dollars per year.

### C. Continued Settlement Negotiations

Both prior to and following the April 7, 2014 Form 8-K announcing compensation-related enhancements, the System and A&F engaged in arm's-length negotiations about the larger issues in the case. While the System believed that the evidence showed significant breaches of duty, the Board and its counsel insisted that Plaintiff could not satisfy the demanding standards to find the futility of a demand on the Board or to allege breaches of fiduciary duty.[43]

---

[40] *Id.* ¶ 26. The due diligence interviews with A&F directors Greenlees and Bachmann were transcribed. Those transcripts, however, are protected as confidential pursuant to a confidentiality agreement between the parties. Copies of those transcripts are available for review at the Court's request.

[41] *Id.* Ex. D at 6.

[42] *Id.* Ex. D at 7-8 (at Home Depot, reforms to align compensation with performance led to 130% increase in stock price since 2007); 8-9 (at Nordstrom, policies similar to those adopted by A&F led to 220% increase in stock price over past 10 years)

[43] Indeed, as described in the Settlement Agreement (ECF No. 18-1 ¶12) , Defendants at all points denied, and continue to deny, all wrongdoing alleged in the Complaint. *See* Lebovitch Decl. ¶¶19, 22.

Among other defenses, Plaintiff anticipated that Defendants would contend that the purported cost to A&F of Jeffries's alleged misconduct was not material to A&F's overall business results, and that any claim for disgorgement of Jeffries's compensation would be substantially limited by the fact that Jeffries was clearly entitled to some level of reasonable compensation, and that his awards were made pursuant to an otherwise valid and binding employment contract.[44]

Settlement discussions were professional, but at times heated and always highly adversarial.[45]  There were disputes about the scope and speed of the document production, and disagreements about the appropriate ways in which governance enhancements could maximize stockholder value going forward.[46]  The parties eventually came to an agreement regarding governance enhancements to resolve the System's claims and significantly benefit the Company and its stockholders.

As part of the agreement between the parties (the "Settlement Agreement"), the A&F Board ultimately agreed to supplement the compensation improvements it had recently adopted in response to Plaintiff's demand with a wide range of ethical, compliance, and internal controls measures.  Among other things, provided the Court grants final approval of the Settlement, the Board has agreed to:

- Appoint a specific executive-level Chief Ethics and Compliance Officer ("CECO"), reporting directly to the Board's Ethics and Compliance Committee, who will be responsible for promoting good ethical behavior at the Company and will serve as the primary contact point for all ethical and business conduct concerns and complaints, including whistleblower complaints;

- Institute clearer and more effective protocols for resolving conflicts of interest at the Company;

---

[44] *Id.* ¶19.

[45] *Id.* ¶21.

[46] *Id.*

- Explore and evaluate the Company's social and governance behaviors, including soliciting feedback from suppliers, customers, and employees, and finalize a new Anti-Corruption Compliance Training Program;

- Recommend that the Company's newly appointed Non-Executive Chairman reach out to the Company's large institutional stockholders to discuss executive compensation;

- Institute and significantly tighten controls over third parties' access to nonpublic, proprietary Company information, including defining and limiting the scope of any such access;

- Require reporting to the General Counsel and Audit Committee any use of Company assets to resolve or to avoid claims related to alleged personal misconduct by any senior executive; and

- Tie executive compensation more closely to the Company's performance, such that executives' interests will be better aligned with A&F stockholders' interests.[47]

As discussed below and detailed in the BHJ Report submitted herewith, the compensation and governance reforms in the Settlement Agreement are a major step forward for the Company, create tangible economic benefits for the Company, and will be instrumental for the Company as the Board looks to build stockholder value going forward.

The Company will likely, as a result of the agreed-upon enhancements, increase earnings relative to peers and to the S&P 500;[48] elevate the status of ethics and compliance management, providing "considerable protection against corporate risk on a financial or reputation level [while] reduc[ing] the likelihood of future expensive lawsuits";[49] avoiding "severe reputational damage" in conjunction with negative say-on-pay votes;[50] be better protected against disclosure of nonpublic A&F information, a "potential substantial destroyer of future value";[51] and be less likely to "use . . . Company assets to settle actions involving personal misconduct allegations[,

---

[47] ECF No. 2-1 (Exhibit A to Settlement Agreement, listing agreed-upon enhancements).

[48] Lebovitch Decl. Ex.D at 7-9, 12.

[49] *Id*. at 13.

[50] *Id*. at 9.

[51] *Id*. at 15.

which] has the potential to encourage inappropriate settlement of actions to protect the reputation of [an] executive."[52]

### III. THE PROPOSED SETTLEMENT MERITS FINAL APPROVAL

The proposed Settlement provides significant benefits to A&F, is the result of intense, arm's-length negotiations between experienced counsel, and merits final approval. If the Court grants final approval, derivative claims (*i.e.*, those belonging to the Company itself) against Defendants will be released in return for the significant enhancements to A&F's corporate governance, internal controls over ethics and compliance, and executive compensation that Defendants have and will implement for the benefit of A&F and its stockholders.

Notably, Plaintiff never asserted or sought to assert direct class action claims relating to the decline in A&F's stock price or any other claims that would be brought directly by and on behalf of stockholders in their individual capacity. Accordingly, the Settlement Agreement did not, and has now been clarified to make express that it does not, release the ability of any A&F stockholder to personally pursue any individual claims such stockholder believes has value.[53]

### A. The Final Approval Standard

Plaintiffs filed this action pursuant to Rule 23.1, which provides that "[a] derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). When seeking approval of a derivative settlement, "the principal factor to be considered . . . is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest. *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). To analyze a derivative settlement, "cases involving dismissal or compromise under Rule 23(e) of nonderivative class actions . . . are relevant by analogy." *Id.*; *see also McDannold v. Star Bank,*

---

[52] *Id.*

[53] ECF No. 18-1 at 13-14 (Settlement Agreement release provisions).

*N.A.*, 1999 WL 33127977, at *2 (S.D. Ohio June 3, 1999), *vacated on other grounds*, 261 F.3d 478 (6th Cir. 2001).

In this regard, the central question is whether the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *Gascho v. Global Fitness Holdings, LLC*, 2014 WL 1350509, at *16 (S.D. Ohio Apr. 4, 2014). Moreover, one court in this District has recognized the value of and specifically praised the parties for agreeing upon a settlement based on pre-filing negotiations, which allowed for prompt resolution once the complaint was filed. *Robinson v. Ford Motor Co.*, 2005 WL 5253339, at *1 (S.D. Ohio June 15, 2005) ("The Court praises the Parties for their efforts in bringing this litigation to quick resolution . . . immediately following the filing of Plaintiffs' Complaint").

Courts routinely recognize that settlements of derivative actions providing non-monetary benefits (such as material changes to corporate governance and compliance) provide real and substantial benefits meriting approval. As the Sixth Circuit recognized in *Granada Investments*, where it affirmed the district court's final approval of a "corporate governance" settlement, a trial court can and often should consider governance changes as "genuinely beneficial." 962 F.2d at 1206; *see also, e.g.*, *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *2 (D.N.J. Oct. 28, 2005) ("*Shell Derivative Litig.*") (approving derivative action settlement that provided governance and compliance relief); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006) (approving settlement because "the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits. The preventive aspect of these provisions is itself a significant benefit of the Settlement."). Indeed, judicial recognition of the importance of

meaningful corporate reforms has increased in the post-Enron era, particularly where, as here, the reforms are aimed at preventing future harm. *AOL Time Warner*, 2006 WL 2572114, at *4.

In determining whether a settlement warrants final approval, the Court considers seven factors: "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). "In considering these factors, the task of the court 'is not to decide whether one side is right or even has the better of these arguments. . . . The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement.'" *Gascho*, 2014 WL 1350509, at *16 (quoting *UAW*, 497 F.3d at 632). Moreover, "[i]n assessing the settlement, the Court must determine 'whether it falls within the range of reasonableness, not whether it was the most favorable possible result in the litigation.'" *Bailey v. AK Steel Corp.*, 2008 WL 495539, at *1 (S.D. Ohio Feb. 21, 2008) (quoting *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 319 (N.D. Ga. 1993)).

## B. The Settlement Provides Significant Benefits to A&F and its Shareholders

As explained above, the compensation-related enhancements that A&F has already implemented on Plaintiff's recommendation that historically would have represented approximately $62 million in value to the Company and its shareholders. If the Company's performance moving forward is consistent with its performance dating back to 2008, the Company will pay out $62 million less in executive compensation than it did over that prior period. Alternatively, if the Company's earnings improve after putting the new compensation structure in place, those earnings will directly benefit the Company and its shareholders. Those

benefits, even if viewed in isolation from the Settlement's various other benefits, far surpass the standard required to approve the Settlement in its entirety.

Moreover, the actions that the Board has agreed to take, provided the Court grants final approval of the Settlement, are extensive and important, and warrant approval in their own right. Specifically, the Board has agreed to implement a number of significant enhancements to improve the Company's internal controls over ethical and compliance management, strengthen the Company's whistleblower policy, increase stockholder outreach efforts, and limit and more effectively manage access to nonpublic Company information. As BHJ opines in its expert report, although those governance enhancements do not lend themselves to a precise dollar quantification, there is a high likelihood that the Company will perform better (and avoid negative outcomes like lawsuits or regulatory problems) in the future as a result of the agreed-upon enhancements.[54]

The enhancements, which are set forth in more detail in the Settlement Agreement[55] and discussed at length in the BHJ Report, include:

1) Creation of a Chief Ethics and Compliance Officer ("CECO") who will report directly, and concurrently, to the General Counsel and the Audit Committee;

2) The Company's Ethics Code will, going forward, apply to all persons with access to proprietary A&F information, even if not employed by the Company;

3) Questions about the Ethics Code will go in the first instance to the CECO, rather than a range of different officers, as is currently the case;

4) The Ethics Code will more explicitly discuss the illegality of payments to officials outside the United States, and any contemplated payments will be reviewed by the CECO;

5) Political contributions will be subject to review by the Board;

---

[54] See Lebovitch Decl. Ex.D at 6-10, 12-13, 15 (discussing potential value of agreed-upon governance enhancements).
[55] See ECF No. 2-1.

6) Permission for an officer, director, or employee to sit on a board of a competitor or potential competitor will require approval by the Board's Nominating and Corporate Governance Committee and will be reported to the full Board;

7) The Company's conflict-of-interest guidelines will be clarified, and conflicts will go to both the CECO and General Counsel for review;

8) Reports of outside independent auditors of possible violations will be reported to the chair of the Audit Committee, the General Counsel, and the CECO;

9) Responsibility to oversee and enforce the Company's whistleblower policy will change to the CECO;

10) The CECO will report issues arising under a whistleblower complaint that involves controls issues to the General Counsel and the head of internal audit;

11) The CECO and General Counsel will have authority to investigate the most serious whistleblower complaints, and will receive reports of any other designated investigators into whistleblower complaints;

12) The CECO will be provided with the resources necessary to undertake the work required and a reasonable budget, which shall be approved by the General Counsel and presented to the Audit Committee for review;

13) The Board will explore and evaluate mechanisms to measure the Company's social and governance behaviors, which may include an annual external review of business practices, employee surveys, and supplier and customer surveys about the ethical underpinnings of their relationships with the Company, as well as consider ways to enhance the manner and frequency in which feedback is solicited from employees and finalize development of a new Anti-Corruption Compliance Training program;

14) The non-executive chairman of the Board will lead a process of reaching out to the Company's large institutional stockholders to discuss executive compensation, along with the chair of the Compensation Committee, and report back to the Compensation Committee;

15) The Company will take steps to ensure that formal arrangements with third parties given access to proprietary information will include safeguards to protect the Company against disclosure of confidential, material, nonpublic proprietary information, as well as such party's acknowledgement and alignment with the Ethics Code, with any waivers to be granted only by the CECO and subsequently reported to the General Counsel and full Board;

16) Any non-employee not governed by a formal arrangement who is given access to nonpublic A&F information will sign a non-disclosure agreement setting out a clearly defined and limited scope of access for specifically articulated purposes, and reported to the CECO and General Counsel;

17) If access to confidential, material, nonpublic proprietary information is granted to any executive's related persons, family members, or individuals in a close relationship, such access shall be subject to a non-disclosure agreement that sets out a clearly defined and limited scope of access for specifically articulated purposes, and reported to the CECO and General Counsel; and

18) If Company assets are used to resolve claims related to material personal misconduct by any senior executive, the General Counsel will provide all relevant information to the Audit Committee, who shall determine whether to approve the use of Company assets in such manner, with such determination to be reported to the Board at its next meeting.[56]

These enhancements both address the System's significant concerns about possible governance failures at the Company, and also provide significant value to the Company and its stockholders.

BHJ also explains that creating the CECO position was "sends a clear message that ethics and compliance have an elevated status" and will "reinforce the message to executives, employees, suppliers and stakeholders that the Company is moving to restore its reputation and ameliorate its future risk profile."[57]  The CECO function, and related enhancements, are definite and provide significant value to the Company and its shareholders.  Specifically, as BHJ notes, a study conducted by Corpedia, now a division of NYSE Governance Services, stock returns of an "ethics index" (comprising companies with, among other things, strong corporate citizenship, governance, and other ethics-related metrics) yielded returns nearly *four times the S&P 500's* returns over the prior five-year period, suggesting that "*companies can achieve significant outperformance through strong ethical practices.*"[58]

A&F has agreed to "well-resourced ethics and compliance programs overseen by a senior officer, [which will] provide considerable protection against corporate risk on a financial or

---

[56] *Id.*

[57] Lebovitch Decl. Ex. D at 13.

[58] *Id.* at 12-13 (emphasis added).

reputation level and reduce the likelihood of future expensive lawsuits."[59]  Moreover, BHJ has opined that the creation of the CECO function at A&F will "have multiple advantages," including "providing a direct reporting line to the Audit Committee"; "providing a single reporting point for any ethical and compliance problems"; "send[ing] a clear message that ethics and compliance have an elevated status and that the Board considers this to be very important in its role overseeing management"; and "send[ing] a message to the market that the Company has taken the problems discovered at the Company seriously and put in place measures to reduce the risk of future problems and reputation damage."[60]

With regard to limiting access to nonpublic A&F information and enhancing board oversight over such access, BHJ's experts recognize that "[i]t is vital to managing [risk to the Company's assets] to put stronger safeguards in place to reduce the risk of proprietary information being disclosed, particularly when it is accessed by non-employees."[61]  Accordingly, the changes the Board has agreed to will "act as a risk management tool to protect the Company's assets and business reputation from potential misuse."[62]  Director Bachmann likewise acknowledged that the agreed-upon enhancements will give the Board and its Committees an opportunity to examine parties to future non-disclosure agreements, and provide a basis for discussing such access and agreements with management.

In sum, both the A&F Board and the corporate-governance experts at BHJ recognize that the agreed-upon enhancements that constitute the bulk of the Settlement Agreement will meaningfully improve the Board's oversight and ability to hold management accountable for the

---

[59] *Id.* at 13.

[60] *Id.*

[61] *Id.* at 15.

[62] *Id.*

Company's performance, will establish clear lines of communication to resolve and protect against ethics and compliance-related problems, will significantly limit who may access nonpublic A&F information and for what purposes, and will enhance the Company's reputation in the corporate governance community.  Those benefits will leave the Company poised to increase A&F's performance and provide more value to stockholders as a result.

### C.  The Settlement is Not the Product of Fraud or Collusion

Where, as here, a proposed settlement is the result of arm's-length negotiations among experienced counsel, courts generally presume that the settlement is non-collusive.  *See, e.g.*, *Bailey*, 2008 WL 495539, at *4 ("Courts presume the absence of fraud or collusion, unless there is evidence to the contrary") (quotation marks and citation omitted); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel"); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair.").  Moreover, as the *Robinson* court recognized, pre-filing negotiations and prompt post-filing settlement may conserve judicial resources and allow for valuable relief to be achieved in a timely manner.  *Robinson*, 2005 WL 5253339, at *1 ("The Court praises the Parties for their efforts in bringing this litigation to quick resolution . . . immediately following the filing of Plaintiffs' Complaint").

Here, the arm's-length nature of negotiations, the critical assistance of experts throughout those negotiations, and the participation of experienced, zealous advocates throughout the litigation strongly support a finding that the Settlement is sufficiently fair, reasonable, and adequate to warrant final approval.  There is no suggestion of, nor a basis to infer, any collusion in connection with this hard-fought agreement.

23

**D.  The Complexity, Expense and Likely Duration of the Litigation Favor Final Approval**

When assessing whether to approve settlements of derivative actions, courts routinely recognize their complexity and inherent unpredictability.  *See, e.g.*, *Shell Derivative Litig.*, 2005 WL 2877899, at *3 ("Derivative suits are by their nature undeniably complex").  "[A]voiding the delay, risks, and costs of continued litigation . . . is a valid reason for counsel to recommend and for the court to approve a settlement."  *In re Nationwide Fin. Servs. Litig.*, 2009 WL 8747486, at *4 (S.D. Ohio Aug. 19, 2009).  Indeed, derivative actions in particular contain a variety of procedural and factual hurdles, and their attenuated risks, that are generally absent from other complex litigation.

This Action is no different.  For example, Plaintiff faces the uphill battle of demonstrating Defendants' bad faith breaches of duty and resulting corporate waste, the effects of any exculpatory provisions in A&F's governance documents on Defendants' liability, complex questions of whether a litigation demand on the A&F Board (including several recently appointed directors whose independence is hard to question) would be futile, and demonstrating and quantifying Plaintiff's money damages claims.  In agreeing to the proposed Settlement, Plaintiff recognized these hurdles and knew that it faced substantial obstacles had it decided to forego the immediate benefits of the Settlement.

Plaintiff also faced the risks and expenses inherent in any complex litigation, including, among other things, dispositive motions practice, other pretrial challenges, battles of the experts, a lengthy trial, and post-trial litigation and appeals.  As the *Nationwide* court recognized, "If the Action had not settled, the parties would have engaged in a time-consuming, and likely disputed, discovery program . . . . [Settlement] secures a substantial benefit . . . in a highly complex action, ***undiminished by further expenses, and without delay, costs, and uncertainty of protracted***

*litigation.*" *Id.* at *4-5 (emphasis added). Here, in light of the myriad factual and legal issues involved, there is no way to predict how Plaintiff's claims would have ultimately been resolved. In light of the substantial benefits of the Settlement, such palpable risks reinforce that the Settlement is well within the range of reasonableness.

### E. Plaintiff Has Engaged in Targeted But Thorough Discovery

In determining whether to approve the Settlement, the Court considers the amount of discovery in order "[t]o insure that Plaintiff[] ha[s] had access to sufficient information to evaluate [its] case and to assess the adequacy of the proposed Settlement." *Id.* at *5. Here, "although the parties were able to negotiate the Settlement at a relatively early stage of the proceedings, all of the parties had a 'clear view of the strengths and weaknesses of their cases." *Id.* (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)); *Bailey*, 2008 WL 495539, at * 3; *Gascho*, 2014 WL 1350509, at *17.

In connection with its initial investigation, the Section 220 Demand, settlement negotiations, and due diligence, Plaintiff has engaged in extensive – yet targeted – discovery. Plaintiff has reviewed approximately 21,000 pages of documents, comprising nonpublic A&F materials produced in response to the Section 220 demand and in due diligence, as well as SEC filings, investor materials, news reports, and filings in multiple litigations.[63] Plaintiff's counsel has also "performed legal research regarding their claims against Defendants and consulted with experts regarding damages . . . and other pertinent issues, *id.*, and interviewed two A&F directors to ensure the fairness and adequacy of the compensation and governance-related enhancements agreed to in the Settlement. Although Plaintiff did not secure sweeping discovery that would likely have proven extraneous and resource-intensive for all parties, Plaintiff's document

---

[63] Lebovitch Decl. ¶23.

discovery and interviews were focused on the specific misconduct underlying Plaintiff's claims, and highly probative with regard to that misconduct.

### F. The Likelihood of Success on the Merits Favors Final Approval

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek*, 636 F.3d at 345 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)). In other words, "in assessing the Settlement, the Court should balance the benefits afforded to [shareholders], and the *immediacy* and *certainty* of a substantial recovery for them, against Plaintiffs' likelihood for success on the merits." *Nationwide*, 2009 WL 8747486, at *2.

Here, Plaintiff faced several significant risks to successfully prosecuting its claims and obtaining meaningful relief for A&F and derivatively for its shareholders through litigation. *First*, in this derivative Action, Plaintiff faced the significant obstacle of establishing that a majority of the A&F Board could not objectively consider a litigation demand and, even if so, that Defendants' conduct was not a valid exercise of business judgment. As the *Nationwide* court recognized, Plaintiff "would certainly have faced challenges that [it] ha[s] failed to rebut the presumption under the business judgment rule that 'directors are better equipped than courts to make business judgments and that the directors acted without self-dealing or personal interest and exercised reasonable diligence and acted in good faith." *Id.* at *3 (quoting *In re Nat'l Century Fin. Enters. Inv. Litig.*, 504 F. Supp. 2d 287, 312 (S.D. Ohio 2007)).

*Second*, Plaintiff's claims that Jeffries's compensation was excessive and improper would have been difficult to prove. Jeffries's compensation was mandated by a valid employment contract, even if the significant amounts paid out did not align with the Company's performance. Claims based on compensation that is "too high" are notoriously challenging. *See, e.g., In re*

*Walt Disney Derivative Litig.*, 907 A.2d 693, 748-49 (Del. Ch. 2005) (rejecting executive compensation claim; such "duty of care violations are rarely found," as "it is a rare, unconscionable case where directors irrationally squander or give away corporate assets"). Likewise, claims of corporate waste in connection with Jeffries's allegedly outsized expenses would have been difficult to prove. *See, e.g.*, *Glazer v. Zapata Corp.*, 658 A.2d 176, 183 (Del. Ch. 1993) (corporate waste claims lie "only when [directors] authorize an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.").

*Third*, even if Plaintiff ultimately would have succeeded in prosecuting claims of breaches of duty in connection with alleged compliance and ethics failures at the Company, any relief would have come only after protracted litigation and would not likely have produced any better result than that achieved in the Settlement. As discussed above and in BHJ's attached expert report, the extensive governance enhancements to which the A&F Board has agreed, particularly regarding internal controls over ethics and compliance, represent all the relief that Plaintiff initially demanded in settlement negotiations and are as complete a package of reforms as reasonably conceivable.

Moreover, beyond those obstacles, A&F is "represented by experienced and competent counsel and [would assuredly] mount[] a zealous and thorough defense." *Gascho*, 2014 WL 1350509, at *18. "Under all of these circumstances, it cannot be said that the likelihood of success on the merits . . . is certain." *Id.* This factor therefore weights in favor of final approval.

## G. Plaintiff and its Counsel Support the Settlement

"'Generally, courts will give deference to plaintiffs counsel's determination to settle a case.'" *Bailey*, 2008 WL 495539, at *4 (quoting *Berry v. School Dist.*, 184 F.R.D. 93, 104 (W.D. Mich. 1998)); *see also Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983) ("The

court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs"); *Hainey v. Parrott*, 617 F. Supp. 2d 668, 675 (S.D. Ohio 2007) (highly experienced litigator's opinion of proposed settlement was "entitled to considerable weight"). *Bronson v. Bd. of Educ.*, 604 F. Supp. 68, 73 (S.D. Ohio 1984)).

Here, Plaintiff's counsel at Bernstein Litowitz Berger & Grossmann LLP ("BLB&G") has significant experience in derivative litigation, and has negotiated substantial derivative settlements.  For example, Plaintiff's counsel represented the company's and shareholders' interests in *In re News Corp. Shareholder Derivative Litigation*, C.A. No. 6285-VCN (Del. Ch. 2013), a derivative action that involved misconduct by members of the corporation's management and that resulted in significant corporate governance reforms, as well as a $139 million recovery.  BLB&G also represented the company's and shareholders' interests in *In re Pfizer Derivative Litigation*, an action that included a significant monetary recovery and also, like this case, resulted in far-reaching corporate governance reforms.  *See In re Pfizer Inc. S'holder Derivative Litig.*, 780 F. Supp. 2d 336 (S.D.N.Y. 2011) (awarding $22 million in attorneys' fees where "separate and apart from any monetary award, ***the settlement . . . will provide significant corporate benefits for Pfizer and its shareholders***.  Moreover, it was achieved despite plaintiffs' considerable legal and practical hurdles in prosecuting this action, risks that were accentuated by the fact that plaintiffs' counsel pursued the action on a fully contingent basis.").  The BLB&G firm resume, attached at Exhibit A to the Lebovitch Declaration, lists numerous other examples of successful outcomes for plaintiffs in shareholder litigation resulting from BLB&G's zealous advocacy.  BLB&G's support for this Settlement should further support approval.

Further, the System's board of trustees received regular briefings on the progress of the action from its general counsel, actively commented on all aspects of the litigation and settlement negotiations, and supports the Settlement. *See Gascho*, 2014 WL 1350509, at *18 (noting that, "[n]ot insignificantly, the Class Representatives have also approved the Settlement Agreement.").

### H. The Reaction of Absent Shareholders Favors Final Approval

Absent significant objections, final approval is appropriate. *See Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (79 objections in class of nearly 11,000 members "tends to support a finding that the settlement is fair"); *In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) ("If only a small number [of opt outs or objections] are received, that fact can be viewed as indicative of the adequacy of the settlement.") (quotation marks and citation omitted); *Hainey*, 617 F. Supp. 2d at 675 ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").

As a forthcoming filing will detail, A&F has timely sent the Notice approved by the Court to A&F shareholders.  To date, only one shareholder has objected to the settlement (*see* ECF No. 20) – which half-page objection is devoid of any legal or factual analysis – and none has moved to intervene in the Settlement.  The one objection, by Patricia A. Dutt ("Dutt"), lacks proof of Dutt's ownership of A&F stock, and does not specifically discuss ANF or the System's allegations at all, instead evincing a general ideological opposition to the legal profession, discussing "ambulance chasing" and attacking the "current legal system earnings process."  In contrast, market reactions to the compensation reforms already announced by the Company have been extremely positive.  A&F has gone from "worst to first" in ISS's governance rankings, in

recognition that both the Company and its shareholders will substantially benefit as a result of the agreed-upon enhancements in the Settlement.[64]

### I. The Settlement is in the Public Interest

"There is a strong public interest in encouraging settlement of complex litigation and class-action suits because . . . settlement conserves judicial resources." *Bailey*, 2008 WL 495539, at *4 (citing *Granada Invs.*, 962 F.2d at 1205). Indeed, the Sixth Circuit has recognized that "[s]ettlements are welcome in cases such as this because litigation is 'notoriously difficult and unpredictable.'" *Granada Invs.*, 962 F.2d at 1205 (quoting *Maher v. Zapata Corp*, 714 F.2d 436, 455 (5th Cir. 1983)). *See also, e.g.*, *Brent v. Midland Funding, LLC*, 2011 WL 3862363, at *12 (N.D. Ohio Sept. 1, 2011) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (quotation marks and brackets omitted); *Nationwide*, 2009 WL 8474786, at *8 ("there is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve.").

Moreover, the public interest is served by the terms of the agreed-upon settlement, which provide not just dramatically enhanced corporate governance – including controls over ethics and compliance – at a large, prominent public company, but in doing so also provide a model for directors of similarly situated companies looking to improve governance and accountability to shareholders. Other such boards of directors may likely see the benefits of improved governance and look to A&F's example and, moving forward, resolve shareholder disputes expeditiously while providing significant benefits to their companies and shareholders.

---

[64] Lebovitch Decl. ¶25; Ex. F.

## IV.      THE REQUESTED FEE AWARD IS FAIR AND SHOULD BE APPROVED

As set forth in detail above, Plaintiff's counsel achieved significant reforms that better align A&F's performance with its executives' compensation, and provide for affirmative obligations on A&F to create new corporate governance and reporting structures that will enhance its quality and ethics and compliance controls going forward, immediately inuring to the benefit of the Company and its shareholders.  Plaintiff's counsel achieved this result through vigorous prosecution of the Action, despite the looming potential of continued hard-fought litigation, significant legal hurdles, and determined and skilled defense counsel.  For its efforts in achieving the substantial benefits under the Settlement, Plaintiff's counsel seeks Court approval attorney's fees in the amount of $2.775 million, inclusive of the reimbursement of expenses in the amount of $38,648.58.[65]  Defendants have no objection to Plaintiff's requested fee and expense award.

The amount of attorney's fees was agreed upon in the wake of an intense arm's-length negotiation among highly experienced counsel, and commenced only after the substantive terms of the settlement had been finalized.[66]  Accordingly, Defendants had no incentive other than to negotiate the lowest possible fee.  "Where, as here, the value of the settlement to class members is reasonable," and where "the parties negotiated the payment of attorneys' fees and costs after having reached agreement" on substantive relief, it is more likely that a fee award is reasonable and the risk of collusion is significantly less.  *Gascho*, 2014 WL 1350509, at *25 (separate negotiations suggest a lower risk of collusion where, as here, relief to the class is fair, reasonable,

---

[65] *Id*. Ex. G (Schedule showing Plaintiff's counsel's lodestar and expenses).  Moreover, these expenses do not include an estimated $40,000 to $50,000, in connection with the fairness hearing, that will be paid out of any award here.  Much of that expense will be in connection with travel costs for Plaintiff's two potential expert witnesses, one of whom resides in Europe, unless the Court indicates that it would prefer that the experts not attend the fairness hearing.

[66] Lebovitch Decl. ¶33.

and adequate.").   Under the circumstances of this case, and when measured against the applicable legal standards and precedent, Plaintiff respectfully submits that the requested award of attorney's fees is reasonable, and respectfully requests the Court's approval.

## A.  Legal Standard Governing Fee Applications

It is well established that where a derivative action provides substantial non-monetary benefits to the nominal defendant corporation, plaintiff's counsel are entitled to an award of reasonable attorneys' fees.  *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *B&G Mining, Inc. v. Director, Office of Workers' Compensation Programs*, 552 F.3d 657, 663 (6th Cir. 2008) (upward adjustment to lodestar appropriate where "the attorney's efforts resulted in exceptional success") (quotation marks omitted); *Barnes v. City of Cincinnati*¸ 401 F.3d 729, 745 (same).

Moreover, as courts in this district have recognized, "[t]he Court must ensure that . . . counsel are fairly compensated for the amount of work done and the results achieved," as "[a]bsent adequate compensation, counsel will not be willing to undertake the risk" of representative litigation.  *Nationwide*, 2009 WL 8747486, at *12 (citing *Rowlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993)).  Indeed, "[a] litigant who creates a . . . 'substantial benefit' allocable with some exactitude to a definite group of persons may acquire an equitable claim against that group for the costs incurred in creating the . . . benefit."  *Smillie v. Park Chem. Co.*, 710 F.2d 271, 275 (6th Cir. 1983).  The Court is required only to determine whether a fee award is "reasonable under the circumstances."  *Rawlings*, 9 F.3d at 517 (citing *Smillie*, 710 F.2d at 275.

Where the benefit is non-pecuniary in nature, the payment of attorneys' fees is justified pursuant to the substantial benefit doctrine.  *Shlensky*, 574 F.2d at 149 ("The plaintiffs in a shareholders' derivative action may, thus, recover their expenses, including attorneys' fees, from

the corporation on whose behalf their action is taken if the corporation derives a benefit, which may be monetary or nonmonetary, from their successful prosecution or settlement of the case."); *see also, e.g.*, *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 488 (D.N.J. 2012) ("corporate governance reforms, unaccompanied by monetary damages, may form the basis for an attorney's fee award where the reforms confer a 'substantial benefit' on the plaintiff corporation"); *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008) (approving fee award for governance reforms because "strong corporate governance is fundamental to the economic well-being and success of a corporation").

In assessing the reasonableness of a fee award, courts in the Sixth Circuit apply the six factors identified in *Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974). Those factors are:

1. The value of the benefits rendered;

2. Society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others;

3. Whether the services were undertaken on a contingent fee basis;

4. The value of the services on an hourly basis;

5. The complexity of the litigation; and

6. The professional skill and standing of all counsel.

*Id.*; *see also In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 381 (S.D. Ohio 2006).

### B. Application of the Legal Standard Supports Approval of the Requested Fee Award

Here, application of the six *Ramey* factors supports the requested attorneys' fees of $2,775,000.

<u>First</u>, as discussed *supra*, the compensation reforms that the A&F Board has already implemented, and the governance enhancements that the Board will implement upon final

approval of this settlement, will provide significant value to A&F and its public shareholders. Those enhancements will improve A&F's quality and compliance efforts going forward, and as discussed above, the provisions of the Settlement are tailored to provide specific solutions to what Plaintiff's investigation identified and the core problems that precipitated this action.  As a result of the Settlement, the Company and its shareholders will enjoy the substantial benefits of compensation that is better aligned with Company performance, as well as the substantial benefits of improved ethics and compliance and significantly strengthened controls over access to nonpublic A&F information.

Courts routinely recognize that, as discussed above with regard to the fairness and adequacy of the Settlement, governance enhancements to better align executive compensation with performance, and to remedy significant historical failures regarding internal controls over ethics and compliance, merit significant fee awards.  Indeed, Plaintiff is not aware of any derivative settlement that provided farther reaching or more impactful governance enhancements than the broad and effective reforms achieved here, including cases with fee awards far in excess of the fees requested here.  This Court should consider both the benefits obtained and fees awarded in, among other cases, the following:

- In the *Schering-Plough* derivative action, the court awarded a fee of $9.5 million and approved a settlement, reached prior to motion practice, that implemented governance changes at the board level and provided for the adoption of a centralized global compliance function at the management level, but did not better align executive compensation with company performance, or improve internal controls over ethical practices, as here.[67]

- In the *Eli Lilly* derivative action, the court awarded a fee of $8.75 million and approved a settlement that expanded the role of preexisting board and management committees over Eli Lilly's compliance systems and implemented a medical risk management system at the company, but did not provide for the creation and

---

[67] The stipulation of settlement in *In re Schering-Plough*, 01-1412 (KSH) (D.N.J. October 3, 2007) is attached to the Lebovitch Decl. as Ex. H.

implementation of an Anti-Corruption and Compliance Training Program, or specific processes and protections for whistleblowers, as here.[68]

- In the *Shell* derivative action, the court awarded $9.2 million in attorneys' fees and approved a settlement that gave institutional investors an opportunity to be involved in the nomination of directors, strengthened independence and stock ownership standards for the board, and expressed a commitment to comply with generally accepted accounting principles, but did not include an agreement for the Company's shareholders to specifically discuss executive compensation with the company's directors, as here, or institute specific metric-based rules in order to strengthen alignment between company performance and executive compensation.[69]

- In the *Home Depot* derivative action, the court awarded $14.5 million in attorneys' fees and approved a settlement that resolved challenged executive compensation. In the settlement, Home Depot adopted corporate governance provisions, including the requirement to have board committee charters available to the public on the company's website, changes to director qualifications and nominating procedures, altering compensation practices, and enhancing shareholder access to management.[70]

- In *Granada Investments*, the Sixth Circuit approved the district court's $3.1 million award of attorneys' fees and its approval of a settlement that included an agreement to designate three new independent directors, to create a special committee to oversee the conduct of the board's Chairman, who had been accused of misconduct, and to hold annual shareholder meetings. 962 F2d at 1205. That settlement did not include the specific enhancements to the company's and the board's ethics and compliance functions present here.

- In *In re AOL Time Warner Shareholder Derivative Litigation*, 2010 WL 363113, at *1 (S.D.N.Y. Feb. 1, 2010), the court awarded $8.8 million in attorneys' fees and approved a settlement focused on governance reforms including centralized oversight of compliance systems, the increased independence of directors and compliance personnel, an expanded operational audit, and a corresponding funding commitment..[71]

---

[68] The stipulation of settlement in *Lambrecht v. Taurel*, 08-cv-0068 (WTL) (S.D. Ind. July 27, 2010) is attached to the Lebovitch Decl. as Ex. I.

[69] The stipulation of settlement in *Unite National Retirement Fund v. Watts*, 04-cv-3603 (D.N.J. Oct. 27, 2005) is attached to the Lebovitch Decl. as Ex. J.

[70] The stipulation of settlement in *City of Pontiac General Employees' Retirement System v. Langone and the Home Depot, Inc.*, 2006-cv-122302 (Sup. Ct. Ga. June 20, 2008) is attached to the Lebovitch Decl. as Ex. K.

[71] *See also, e.g., In re Juniper Networks Deriv. Actions*, No. 5:06-cv-03396-JW, Order and Final Judgment (N.D. Cal. Nov. 13, 2008) ($9 million fee where settlement comprised changes to stock option granting procedures, limits on excessive equity grants, and appointment of independent directors) (settlement stipulation at Lebovitch Decl. Ex. L); *Moore v. Brown, et al.*, No. 6:04-cv-77, slip op. (E.D. Tex. Mar. 10, 2008) ($6 million fee award where settlement included limits on non-independent directors,

Here, as discussed above and as supported by BHJ's expert report, the governance enhancements in the Settlement exceed those in the cases discussed and referred to herein, many of which had fees far in excess of the $2.775 million requested here.  Indeed, the $62 million in historical savings (and related, potential future savings) represented by the compensation reforms alone warrants the requested $2.775 million fee, or approximately 4.4% of those anticipated savings.  *Granada Invs.*, 962 F.2d at 1207 ("anticipated impact of the corporate governance changes" in settlement was estimated as "potential savings of $108 million," which supported award of fees and expenses constituting" 4% of the anticipated savings").

Second and third, as courts routinely recognize, rewarding attorneys who prosecute actions on behalf of shareholders in a class or derivative actions "is important because . . . most individuals would lack the resources to litigate cases, and individual recoveries are often too small to justify the burden and expense of such litigation."  *Nationwide*, 2009 WL 8747486, at *14; *see also In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 2009 WL 1473975, at *4 (S.D.

---

backdating-related reforms, and mandated compensation consultant) (settlement stipulation at Lebovitch Decl. Ex. M); *In re Gen. Motors Corp. Derivative Litig.*, MDL No. 06-1749, Order Approving Settlement (E.D. Mich. Dec. 22, 2008) ($5.38 million fee where settlement comprised appointing "financial experts" to audit committee, director attendance requirements, commitment to circulate board materials 48 hours in advance of meetings, reorganized tax department, and obligation that compensation committee recommend changes to executive compensation) (settlement stipulation at Lebovitch Decl. Ex. N); *In re F5 Networks, Inc. Derivative Litig.*, No. C06-794 RSL, Order and Final Judgment, slip op. (W.D. Wash. Jan. 6, 2011) (awarding fee and expense amount of $5 million where consideration consisted of corporate governance reforms); *Warner v. Lesar*, No. 2011-09567, Order Approving Settlement and Judgment, slip op. (Tex. Dist. Ct., Harris Cnty. Oct. 1, 2012) (awarding fee and expense amount of $7.75 million where consideration consisted of corporate governance reforms); *In Re Chiquita Brands Int'l, Inc, Alien Tort Statute & S'holder Derivative Litig.*, No. 08-01916 (S.D Fla) (awarding fee and expense amount of $4 million where consideration consisted of corporate governance reforms); *Rowe. v. Fishman*, No. 04-4576 (D. Minn, Sept. 6, 2007) (awarding fee and expense amount of $5.25 million where consideration consisted of corporate governance reforms); *Policemen & Firemen Ret. Sys. of Detroit v. Cornelison*, No. 2009-29987 (Tex. Dist. Ct. July 9, 2012) (awarding fee and expense amount of $7 million where consideration consisted of corporate governance reforms); ;  *In re Bristol-Myers Squibb Deriv. Litig.*, No. 02-cv-8571, Order Awarding Attorneys' Fees and Expenses (S.D.N.Y. July 22, 2005) (awarding fees and expenses of $3.5 million in derivative settlement resulting in corporate governance reforms).

Ohio May 27, 2009) (Graham, J.) ("granting the fee request will serve society's interest in rewarding attorneys who produce such benefits in order to maintain an incentive to others"); *In re Sulzer Hip Prosthesis and Knee Prosthesis Liability Litig.*, 268 F. Supp. 2d 907, 935 (N.D. Ohio 2003) (attorneys who litigated case "serve a benefit to society" by "providing benefits to a class of people who are very much in need of help") (quotation marks and citation omitted). Likewise, where, as here, counsel litigated on a contingent basis while incurring expenses, an enhanced fee award is warranted. *See, e.g.*, *In re Elan Sec. Litig.*, 385 F. Supp. 2d 363, 374 (S.D.N.Y. 2005) (recognizing "the risk to counsel of pursuing this case on a contingency basis" as "perhaps the foremost factor to be considered in determining whether to award an enhancement"); *Nat'l Century*, 2009 WL 1473975, at *4 (Graham, J.) (awarding fee in light of risks of contingent representation).  Accordingly, those factors support the requested fee award, to which Defendants do not object.

Fourth, Plaintiff's Counsel's lodestar in this matter is $644,142.50 and, as such, after subtracting the expenses incurred thus far and expenses anticipated in connection with the scheduled fairness hearing, the requested fee award represents a 4.2x multiplier, consistent with fees awarded in this district and elsewhere.[72]  *Nationwide*, 2009 WL 8747486, at *15 (citing *Broadwing*, 252 F.R.D. at 381 for reasonableness of multipliers of 5.0x); *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181 (D. Mass. 1998) (8.9x multiplier in derivative action); *In re Metro Mobile CTS, Inc. S'holders Litig.*, 1993 Del. Ch. LEXIS 448 (Del. Ch. Aug. 18, 1993) (multiplier of 5.6x); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation.").

---

[72] Lebovitch Decl. Ex. G.

<u>Fifth</u>, as discussed above, this derivative action involves "highly-specialized and complex areas of the law, which supports the requested fee award," given that Plaintiff's claims involved "complex questions of law and fact, including the fiduciary duties owed by [A&F] directors to their shareholders." *Nationwide*, 2009 WL 8747486, at *15. Indeed, the central focus of Plaintiff's claims – directly responding to and resolving compensation and governance-related problems, including regarding internal controls over ethics and compliance – presented challenging issues that required expert assistance in developing a sophisticated and carefully tailored set of settlement proposals.

<u>Sixth</u>, and finally, the instant litigation included the participation of highly skilled and specialized attorneys, including BLB&G and Strauss Troy Co., LPA on behalf of Plaintiff, and Skadden, Arps, Slate, Meagher & Flom LLP along with Vorys, Sater, Seymour and Pease LLP on behalf of Defendants and the Company. As the *Nationwide* court recognized, both "highly experienced" Plaintiff's counsel, and the fact that "Plaintiffs and their counsel were faced with formidable opposition [including] very skilled and experienced counsel in securities and transaction litigation, who could draw upon the exceptional resources of their nationally recognized law firm[] . . . [are] factor[s] that may be considered when evaluating a fee request." *Id*. at *7, 15.

Each of those *Ramey* factors, then, supports the fee award agreed to by the Parties. Accordingly, Plaintiff respectfully requests that the Court approve that fee award.

## V.        CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to grant final approval of the Settlement; and to grant Plaintiff's counsel's requested fee and expense award.

STRAUSS TROY CO., LPA

Dated: November 28, 2014

By:      /s/ Richard S. Wayne

Mark Lebovitch
Adam D. Hollander
BERNSTEIN LITOWITZ BERGER &
    GROSSMANN, LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

*Lead Counsel for Derivative Plaintiff*
*The City of Plantation Police Officers'*
*Employees' Retirement System*

Richard S. Wayne
The Federal Reserve Building
150 East Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 629-9472
Facsimile: (513) 629-9426
rswayne@strausstroy.com

*Liaison Counsel for Derivative Plaintiff*
*The City of Plantation Police Officers'*
*Employees' Retirement System*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been filed electronically with the U.S. District Court this 28th day of November, 2014.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.  If a party is not given notice electronically through the Court's system a copy will be served by ordinary United States mail, first class postage prepaid, this 28th day of November, 2014.

/s/ Richard S. Wayne_____
Richard S. Wayne (0022390)