IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

THE CITY OF PLANTATION POLICE
OFFICERS' EMPLOYEES' RETIREMENT
SYSTEM,

          **Plaintiff,**

    **vs.**                      **Civil Action 2:14-cv-1380**
                                  **Judge Graham**
                                  **Magistrate Judge King**

**MICHAEL S. JEFFRIES,** *et al.*,

          **Defendants.**

## REPORT AND RECOMMENDATION

    This matter is before the Court, pursuant to the *Order of Reference*, ECF 27, on *Plaintiff's Motion For Final Approval of Derivative Litigation Settlement and Award of Attorneys' Fees and Reimbursement of Expenses*, ECF 22. The Court conducted a fairness hearing on December 18, 2014. *See Transcript of Fairness Hearing*, ECF 29.

## I.   Background

    This is a stockholder derivative action brought against Abercrombie & Fitch, Co. ("Abercrombie," "A&F", or "ANF"), its CEO Michael Jeffries,[1] and its Board of Directors.  The plaintiff shareholder, The City of Plantation Police Officers' Employees' Retirement System, brings suit on behalf of Abercrombie to remedy alleged breaches of fiduciary duties owed by the individual defendants to Abercrombie.  Abercrombie is a clothing retailer incorporated in

---

[1]  Mr. Jeffries resigned as CEO of Abercrombie shortly before the fairness hearing. *Transcript of Fairness Hearing, PAGEID* #1077-78.

Delaware with its principal place of business in New Albany, Ohio. Plaintiff is a retirement plan that is treated as a citizen of Florida for purposes of diversity jurisdiction.

### A. Alleged Wrongdoing

The *Verified Stockholder Derivative Complaint* ("*Complaint*"), ECF 1, alleges that, from 2008 until mid-2014, Abercrombie was outperformed by its industry peer group by 369% and by the S&P 500 Apparel Retail Index by 321%. *Id.* at ¶ 5. By the end of fiscal year 2013, Abercrombie closed nearly 30 percent of its stores in the United States and suffered asset impairments and operating losses of over $500 million. *Id.* The *Complaint* alleges that Jeffries has received over $140 million in compensation since 2008, incurred massive personal and business-related travel expenses, and delegated "managerial-like authority" and access to nonpublic Abercrombie documents to one Matthew Smith, who is not employed by Abercrombie and who allegedly owes no duties to Abercrombie. *Id.* at ¶¶ 6, 8, 10. The *Complaint* alleges that the Board knew of each of these problems but failed to take corrective action.

The *Complaint* asserts a single claim for breach of fiduciary duty against Jeffries and the members of the Board. The *Complaint* alleges that defendants "are fiduciaries of the Company and its stockholders" and owe a duty of loyalty, due care, and good faith fair dealing. *Id.* at ¶ 133. In addition to general fiduciary duties imposed by law, defendants allegedly also owed specific fiduciary duties created by the company's governance documents. *Id.* at ¶ 134. The *Complaint* further alleges that the

Individual Defendants consciously violated their fiduciary duties and corporate responsibilities in at least the following ways:

a. Failing to align Jeffries's and other executives' compensation with ANF's performance so as to adequately incentivize executive performance and reward executives for positive results;

b. Failing to seriously consider stockholders' input with regard to executive compensation, rather than seeking to placate stockholders without making any meaningful change;

c. Failing to restrict access to confidential ANF documents and information and impose and enforce internal controls to limit such access; and

d. Failing to impose and enforce internal controls over ethics and compliance, including by monitoring and restricting Company spending related to Jeffries's travel.

*Id*. at ¶ 135.

The *Complaint* alleges that, as a result of defendants' breaches of fiduciary duties, Abercrombie has sustained "significant" financial losses and damage to its corporate image and goodwill.  *Id*. at ¶ 136. The *Complaint* demands relief in the form of an order requiring the company and defendants to take corrective measures to guard against further breaches and requiring defendants to pay the company the amounts by which it has been damaged as a result of the alleged breaches.

**B.    Proposed Settlement**

A compromise of this dispute was in motion well before the *Complaint* was filed.  Plaintiff began investigating its claims in late 2013 by reviewing, *inter alia*, public filings with the Securities and Exchange Commission, filings in other lawsuits, and media, analyst, and proxy advisor reports regarding Abercrombie's business, financial performance, and corporate governance.  *Declaration of Mark Lebovitch*

("*Lebovitch Declaration*"), ECF 21-1, ¶¶ 4-7. On January 29, 2014, plaintiff sent a letter pursuant to Section 220 of the Delaware General Corporation Law to Abercrombie's Board and Corporate Secretary, demanding inspection of Abercrombie's books and records to investigate potential breaches of fiduciary duty by the Board. *Id*. at ¶ 9, Exhibit B. A supplemental Section 220 demand letter was sent on February 28, 2014. *Lebovitch Declaration*, ¶ 13, Exhibit C. In response to these demands, Abercrombie produced more than 21,000 documents, including minutes of meetings of the Board and its Audit and Compensation Committees, presentations by Abercrombie's compensation advisors, documents reflecting the negotiation of Jeffries' current employment agreement, Jeffries' expense report, and documents related to Smith. *Id*. at ¶¶ 15, 23. Based on its review of these documents and on its own investigation, plaintiff determined that "it had a valid basis to bring a derivative action on behalf of the Company alleging that Defendants breached their fiduciary duties in connection with executive compensation and corporate governance failures." *Complaint*, ¶ 103.

After Abercrombie produced documents in response to plaintiff's Section 220 demands, plaintiff retained BHJ Partners LLC ("BHJ"), a firm that offers consulting services in areas related to corporate governance. *Lebovitch Declaration*, ¶ 16; *Shareholder Value Analysis Report of Compensation and Governance Remediation at Abercrombie & Fitch* ("*BHJ Report*"), attached to *Lebovitch Declaration* as Exhibit D. Plaintiff and BHJ drafted a proposed set of governance reforms related to compensation, compliance, and ethics, and presented them to the

Board.  By mid-2014, the Board's Compensation Committee approved substantial changes to executive compensation that, according to the *Complaint*, conformed to plaintiff's demands.  *See Complaint*, ¶¶ 108-115.  The parties continued to negotiate plaintiff's demands for ethics, governance, and compliance reforms.

On August 29, 2014, plaintiff filed this action and sought, without opposition by defendants, preliminary approval of a proposed settlement.  *Plaintiff's Motion for Preliminary Approval of Derivative Litigation Settlement,* ECF 2. The Court denied the motion for preliminary approval on September 26, 2014, finding that plaintiff had failed to demonstrate that the proposed settlement provided fair consideration to absent shareholders in exchange for a broad release of claims.  *Opinion and Order Denying Motion for Preliminary Approval of a Settlement in a Derivative Action*, ECF 14.  The parties revised the release language and again sought preliminary approval on September 29, 2014*. Plaintiff's Motion to (1) Reconsider the Court's Opinion and Order Denying Motion for Preliminary Approval, (2) Approve Clarifying Changes to the Settlement Release, and (3) Stay the Court's Order Pending Ruling on These Motions*, ECF 15. The Court granted that motion on October 10, 2014, and ordered the parties to provide to Abercrombie's shareholders notice of the proposed settlement.  *Order*, ECF 19.

The *Amended Stipulation and Agreement of Settlement*, ECF 18-1, releases only those shareholder claims that are derivative, and not direct, in nature.  The settlement would memorialize changes to executive compensation that appear to have already made by the Board,

*see id*. at ¶ 27; *Stipulation and Agreement of Settlement*, ECF 2-6, ¶ 34, and would also require reforms "in the areas of ethical and compliance management" and "internal controls," *Stipulation and Agreement of Settlement*, ¶ 34.  Plaintiff has summarized the reforms as follows:

1) Creation of a Chief Ethics and Compliance Officer ("CECO") who will report directly, and concurrently, to the General Counsel and the Audit Committee;

2) The Company's Ethics Code will, going forward, apply to all persons with access to proprietary A&F information, even if not employed by the Company;

3) Questions about the Ethics Code will go in the first instance to the CECO, rather than a range of different officers, as is currently the case;

4) The Ethics Code will more explicitly discuss the illegality of payments to officials outside the United States, and any contemplated payments will be reviewed by the CECO;

5) Political contributions will be subject to review by the Board;

6) Permission for an officer, director, or employee to sit on a board of a competitor or potential competitor will require approval by the Board's Nominating and Corporate Governance Committee and will be reported to the full Board;

7) The Company's conflict-of-interest guidelines will be clarified, and conflicts will go to both the CECO and General Counsel for review;

8) Reports of outside independent auditors of possible violations will be reported to the chair of the Audit Committee, the General Counsel, and the CECO;

9) Responsibility to oversee and enforce the Company's whistleblower policy will change to the CECO;

10) The CECO will report issues arising under a whistleblower complaint that involves controls issues to the General Counsel and the head of internal audit;

11) The CECO and General Counsel will have authority to investigate the most serious whistleblower complaints, and will receive reports of any other designated investigators into whistleblower complaints;

12) The CECO will be provided with the resources necessary to undertake the work required and a reasonable budget, which shall be approved by the General Counsel and presented to the Audit Committee for review;

13) The Board will explore and evaluate mechanisms to measure the Company's social and governance behaviors, which may include an annual external review of business practices, employee surveys, and supplier and customer surveys about the ethical underpinnings of their relationships with the Company, as well as consider ways to enhance the manner and frequency in which feedback is solicited from employees and finalize development of a new Anti-Corruption Compliance Training program;

14) The non-executive chairman of the Board will lead a process of reaching out to the Company's large institutional stockholders to discuss executive compensation, along with the chair of the Compensation Committee, and report back to the Compensation Committee;

15) The Company will take steps to ensure that formal arrangements with third parties given access to proprietary information will include safeguards to protect the Company against disclosure of confidential, material, nonpublic proprietary information, as well as such party's acknowledgement and alignment with the Ethics Code, with any waivers to be granted only by the CECO and subsequently reported to the General Counsel and full Board;

16) Any non-employee not governed by a formal arrangement who is given access to nonpublic A&F information will sign a non-disclosure agreement setting out a clearly defined and limited scope of access for specifically articulated purposes, and reported to the CECO and General Counsel;

17) If access to confidential, material, nonpublic proprietary information is granted to any executive's related persons, family members, or individuals in a close relationship, such access shall be subject to a non-disclosure agreement that sets out a clearly defined and limited scope of access for specifically articulated purposes, and reported to the CECO and General Counsel; and

18) If Company assets are used to resolve claims related to material personal misconduct by any senior executive, the General Counsel will provide all relevant information to the Audit Committee, who shall determine whether to approve the use of Company assets in such manner, with such determination to be reported to the Board at its next meeting.

*Memorandum of Law in Support of Plaintiff's Motion for Final Approval of Derivative Litigation Settlement and Award of Attorneys' Fees and Reimbursement of Expenses* ("*Plaintiff's Memorandum*"), ECF 21, pp. 19-21. The proposed settlement also provides that Abercrombie will pay up to $2,775,000 for plaintiff's attorneys' fees, costs, and expenses, as determined by the Court. *Amended Stipulation and Agreement of Settlement*, ¶ 37. The settlement contemplates that the Court "may consider and rule upon the fairness, reasonableness, and adequacy of the Settlement independently of any award of Attorneys' Fees and Expenses." *Id*. No other monetary payment, either to Abercrombie or to its shareholders, is contemplated by the proposed settlement.

**C.   Notice and Objections**

Notice of the revised settlement terms and of the December 18, 2014 fairness hearing was sent to all persons and entities who held shares of Abercrombie common stock as of the close of business on August 29, 2014. *Affidavit of Mailing*, ECF 25, ¶ 2. In total, notice was mailed to 35,332 shareholders. *Id*. at ¶ 8. One objection has been filed with the Court. *Objection to Proposed Settlement*, ECF 20. That objection, filed by one Patricia A. Dutt, voices concern only about the amount of the proposed attorneys' fee award. *Id*.

Plaintiff moved for final approval of the revised settlement agreement and for an award of attorneys' fees and expenses on December

1, 2014. *Plaintiff's Motion for Final Approval of Derivative Litigation Settlement and Award of Attorneys' Fees and Reimbursement of Expenses* ("Plaintiff's Motion"), ECF 22. Abercrombie supports that motion. *Response of Nominal Defendant Abercrombie & Fitch Co. in Support of Plaintiff's Motion for Final Approval of Derivative Litigation Settlement*, ECF 23. As noted *supra*, a fairness hearing was held on December 18, 2014. Counsel for plaintiff and Abercrombie appeared at the hearing; no appearance was made by or on behalf of any objector. *Transcript of Fairness Hearing, PAGEID* #1065.

This matter is now ripe for consideration.

## II. Standard

Under Fed. R. Civ. P. 23.1(c), a "derivative action may be settled, voluntarily dismissed, or compromised only with the court's approval." The "principle factor" to be considered in a proposed settlement "is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d Cir. 1978). *See also In re Intel Corp. Derivative Litig.*, No. 09-cv-867, 2010 WL 2955178, at *1 (D. Del. July 22, 2010).

In evaluating derivative action settlements, courts have borrowed from the law governing class actions under Rule 23. *See* 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1839 (3d ed. 2014). The pertinent inquiry is whether the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this determination, a court must consider a number of factors:

> "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).  The task of the court "is not to decide whether one side is right or even whether one side has the better of these arguments. . . .  The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632.

## III.  The Proposed Settlement

### A.    Benefit of the Proposed Settlement

The primary benefit of the proposed settlement is the institution of corporate reforms to executive compensation and ethics/internal controls, as outlined *supra*.  Assigning a value to such reforms can be difficult; in an effort to do so, plaintiff secured the services and expert opinion of BHJ, whose report provides a detailed breakdown of the proposed reforms and the benefits of the reforms.  *Shareholder Value Analysis Report of Compensation and Governance Remediation at Abercrombie & Fitch,* ECF 21-2. According to BHJ, had the reforms to executive compensation been in place from 2011 to 2013, Abercrombie would have "either saved more than $62 million in excess compensation or would have been driven to perform at the peer levels to produce greater value for the shareholders." *Id.*, *PAGEID* #575.  The report also points to studies supporting the proposition that companies with strong ethical practices and controls generally outperform the S&P 500

average return. *Id., PAGEID* # 571. With regard to the ethics and internal controls portions of the proposed settlement, BHJ specifically concluded that Abercrombie would "have greatly reduced or eliminated the litigation and reputation costs associated with the leadership practices; and, would have placed the firm in line with ethically operated firms that over a five year period produced a 105% return as compared to a 26% for the S&P 500 Index companies." *Id.* According to BHJ, the ethical reforms contemplated by the proposed settlement, which include the creation of a Chief Ethics and Compliance Officer and amendments to Abercrombie's whistleblower policy, will reduce the likelihood of future litigation, protect against breaches of the Foreign Corrupt Practices Act, and will protect against corporate risk on a financial and reputational level. Id., PAGEID #572.

The parties hope that the reforms contemplated by the proposed settlement will improve Abercrombie's performance. Even if those reforms do not have that expected result, however, the parties suggest that the proposed settlement will nevertheless work to the corporation's financial benefit because its executive compensation structure will be better aligned with the company's performance. As evidenced by the *BHJ Report*, these potential savings are substantial. Although the actual monetary value of the expected benefits cannot be precisely calculated, the Court concludes that the proposed settlement will confer a substantial benefit upon Abercrombie and upon its shareholders. *See Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203,

1206 (6th Cir. 1992); *In re AOL Time Warner S'holder Derivative Litig.*, 02-civ-6302, 2006 WL 2572114, at *4 (S.D.N.Y. Sept. 6, 2006).

**B.    Risk of Fraud or Collusion**

Having carefully examined the terms and benefits of the proposed settlement, the Court now turns to the first *UAW* factor, *i.e.*, the risk of fraud or collusion.  *See Poplar Creek Dev. Co.*, 636 F.3d at 244; *UAW*, 497 F.3d at 631.  Courts have expressed concern that settlements in class and derivative actions can act as vehicles for collusion "that primarily serve the interests of defendants — by granting expansive protection from law suits — and of plaintiffs' counsel — by generating large fees gladly paid by defendants as a quid pro quo for finally disposing of many troublesome claims."  *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 778 (3d Cir. 1995).  Collusive settlements "usually come as a cash award to counsel, a broad release of claims, and a cosmetic non-cash recovery for the absent shareholders."  *In re Zoran Corp. Derivative Litig.*, No. 06-cv-5503, 2008 WL 941897, at *2 (N.D. Cal. Apr. 7, 2008).  Here, plaintiff filed suit and simultaneously presented the Court with proposed terms of settlement that include an award of fees to plaintiff's attorneys of up to $2,775,000 and no cash recovery for either the company or its shareholders.  Nevertheless, the Court concludes that the risk of fraud or collusion is, under the circumstances, small.

As discussed *infra*, the parties engaged in extensive, targeted discovery in response to a Section 220 demand by plaintiff prior to entering into the proposed settlement and filing this action.

Although the proposed settlement does not provide for a cash payment to Abercrombie, the benefits of the proposed settlement are, as the Court concludes *supra*, substantial and directly address the alleged deficiencies identified by plaintiff through discovery and detailed in the *Complaint*.  The release required by the settlement is also limited to those shareholder claims that are derivative, and not direct, in nature.  Plaintiff's use of a Section 220 demand prior to filing suit has been strongly encouraged by the Delaware Supreme Court, *King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011), and, as this Court has previously recognized, *see Robinson v. Ford Motor Co.*, No. 1:04-cv-00844, 2005 WL 5253339 (S.D. Ohio June 15, 2005), shareholders can benefit from the quick resolution of complex litigation such as this, so long as the investigation of the claims has been adequate and so long as the settlement contemplates substantial benefits to the corporation and its shareholders.

The Court also notes plaintiff's counsel's representation that settlement negotiations were "professional, but at times heated and always highly adversarial." *Lebovitch Declaration*, ¶ 21.  Plaintiff's counsel also represents that the parties reached agreement on the substantive terms of the settlement before negotiating the issue of attorneys' fees.  *Id*. at ¶ 32.  Although there is no *per se* rule that separate negotiations will lessen the likelihood of collusion, separate negotiations in fact present a lower risk of collusion where, as here, the relief obtained is substantial and directly addresses the alleged wrongdoing.  *See Gascho v. Global Fitness Holdings, LLC*, No. 2:11-cv-436, 2014 WL 1350509, at *25 (S.D. Ohio Apr. 4, 2014)

(internal citations omitted) *report and recommendation adopted,* No. 2:11-cv-436, 2014 WL 3543819 (S.D. Ohio July 16, 2014), *appeal pending* Case No. 14-3761/14-3798 (6th Cir.).

In sum, the Court concludes that this factor weighs in favor of finding the proposed settlement to be fair, adequate, and reasonable.

**C.    The Amount of Discovery Engaged in by the Parties**

Although plaintiff filed this action with a proposed settlement in place, plaintiff spent more than eight months investigating its claims before filing the *Complaint*.  Moreover, Abercrombie has produced more than 21,000 documents, including minutes of meetings of the Board and its Audit and Compensation Committees, presentations by Abercrombie's compensation advisors, documents reflecting negotiations of Jeffries' current employment agreement, Jeffries' expense report, and documents related to Smith.  *Lebovitch Declaration*, ¶¶ 4-7, 15, 23.  This informal discovery offered the parties the opportunity to assess the strengths and weaknesses of each other's litigation positions.  *See Complaint,* ¶ 103 (Based on its review of these documents and on its own investigation, plaintiff determined that "it had a valid basis to bring a derivative action on behalf of the Company alleging that Defendants breached their fiduciary duties in connection with executive compensation and corporate governance failures.").  Consideration of this factor therefore weighs in favor of finding the proposed settlement to be fair, adequate, and reasonable.

**D.    The Likelihood of Success on the Merits**

"The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits.  The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured." *Poplar Creek Dev. Co.*, 636 F.3d at 245 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.,* 726 F.2d 1075, 1086 (6th Cir. 1984)).

The *Complaint* asserts a single derivative claim for breach of fiduciary duty against Jeffries and the Board members.  The claim is premised on two theories, excessive executive compensation and expenses and mismanagement by failure of oversight.  *See Complaint*, ¶ 135.  Although plaintiff may have had "a valid basis to bring a derivative action," *see Complaint,* ¶ 103, the parties recognize that plaintiff's claims would have been difficult to prove.

Rule 23.1 requires the plaintiff in a shareholder derivative action to "state with particularity" the efforts made to obtain the action desired from the board of directors, and the reasons for failing to make a pre-suit demand. Fed. R. Civ. P. 23.1(b)(3). "[W]hether the failure to make a demand is excused must be determined under the substantive law of the state of incorporation." *McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001) *amended on denial of reh'g,* 250 F.3d 997 (6th Cir. 2001).  "[T]he law of the state of incorporation controls even when derivative claims are brought under federal law." *Id*. (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991)).  This Court must therefore look to the demand requirements under Delaware law.

15

"A basic premise of corporate governance under Delaware law is that the directors, rather than the shareholders, manage the business and affairs of the corporation." *Id.* (citing *Aronson v. Lewis,* 473 A.2d 805, 811 (Del. 1984)). "Yet, shareholders are not powerless to challenge director action that harms the corporation. 'The machinery of corporate democracy and the derivative suit are potent tools to redress the conduct of a torpid or unfaithful management.'" *Id.* (quoting *Aronson*, 473 A.2d at 811). "Because derivative suits challenge the propriety of decisions made by directors under their authority, 'stockholder plaintiffs must overcome the powerful presumptions of the business judgment rule before they will be permitted to pursue the derivative claim.'" *Id.* (quoting *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993)).

The business judgment rule offers protection to the Board as the ultimate decision-maker of the corporation. "Because courts are ill equipped to engage in *post hoc* substantive review of business decisions, the business judgment rule operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 746 (Del. Ch. 2005) (internal quotation marks omitted) *aff'd,* 906 A.2d 27 (Del. 2006). Where, as here, plaintiff alleges corporate waste (in the form of excessive compensation and travel expenses), the bar is particularly high:

> Corporate waste is very rarely found in Delaware courts because the applicable test imposes such an onerous burden upon a plaintiff – proving an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration. In other words, waste is a rare,

> unconscionable case where directors irrationally squander
> or give away corporate assets.

*Id.* at 748-49 (internal quotation marks and footnotes omitted). With
respect to the alleged internal compliance failures involving Smith,
plaintiff could face substantial difficulty in establishing as a
factual matter that the Board had knowledge of the full extent of
Smith's influence at Abercrombie and access to the corporation's
affairs.

Even if plaintiff were able to rebut the presumption created by
the business judgment rule, plaintiff's claim for excessive
compensation would nevertheless be difficult to prove. *See In re Walt
Disney Co. Derivative Litig.*, 907 A.2d 693 (Del. Ch. 2005). Even if
plaintiff were successful in this regard, it is highly unlikely that
litigation would secure the specific non-monetary relief secured by
the proposed settlement.

Furthermore, plaintiff would also face significant hurdles in
proving a breach of fiduciary duty. Under Delaware law, corporate
directors must "use that amount of care which ordinarily careful and
prudent men would use in similar circumstances," *Graham v. Allis-
Chalmers Mfg. Co.*, 188 A.2d 125, 130 (Del. 1963), and "consider all
material information reasonably available" in making business
decisions, *Brehm v. Eisner*, 746 A.2d 244, 259 (Del. 2000). Alleged
deficiencies in the performance of directors' duties are actionable
only if their actions are grossly negligent. *Id.* In order to
establish a breach, a plaintiff pursuing such a claim must establish
that a decision of the board resulted in loss because that decision
was ill advised or grossly negligent or that a board's failure to act

17

resulted in loss because due attention would have prevented the loss. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). This is no easy task. *See id.* ("The theory here advanced is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.").

Under all of these circumstances, it cannot be said that the likelihood of success on the merits of plaintiff's claim is certain. This factor therefore weighs in favor of approval of the proposed settlement.

**E.   Complexity, Expense, and Likely Duration of the Litigation**

Generally speaking, most derivative litigation is inherently complex, *see Ross v. Bernhard*, 396 U.S. 531, 545 n.5 (1970); *Unite Nat'l Ret. Fund v. Watts*, No. 04-CV-3603, 2005 WL 2877899, at *3 (D.N.J. Oct. 28, 2005) ("Derivative suits are by their nature undeniably complex . . . ."), "'and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *In re Telectronics Pacing Sys., Inc.*, 137 F.Supp. 2d 985, 1013 (S.D. Ohio 2001) (quoting *In re Austrian & German Bank Holocaust Litig.,* 80 F.Supp. 2d 164, 174 (S.D.N.Y. 2000)). This action is no exception to that general rule. As noted *supra*, plaintiff would face significant obstacles in proving its claims. Even though the parties had a settlement in place when this action was filed, plaintiff has already incurred substantial attorneys' fees, and continued litigation would undoubtedly require years more of litigation and would involve additional fact discovery, expert discovery, and other motion practice

that would likely be both extensive and costly.  Consideration of this factor therefore weighs in favor of approving the proposed settlement.

**F.    The Opinions of Class Counsel and Class Representatives**

Experienced counsel on both sides of this case recommend that the Court approve the proposed settlement and this recommendation is entitled to deference.  *See, e.g.*, *Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983) ("The court should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs[,]" and that deference "should correspond to the amount of discovery completed and the character of the evidence uncovered."). Counsel for plaintiff and Abercrombie represented at the fairness hearing that the proposed settlement was fair, adequate, and reasonable, and plaintiff's counsel indicated that plaintiff's general counsel reviewed and approved the proposed settlement.  *Transcript of Fairness Hearing*, *PAGEID* #1087.  Consideration of this factor therefore weighs in favor of approving the proposed settlement.

**G.    The Reaction of Shareholders**

In determining whether a settlement is fair, adequate and reasonable, a court must also consider the reaction of absent shareholders.  *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013).  Notice of the revised settlement and of the December 18, 2014 fairness hearing was sent to all persons and entities who held shares of Abercrombie common stock as of the close of business on August 29, 2014.  *Affidavit of Mailing*, ¶ 2.  In total, notice was mailed to 35,332 shareholders.  *Id.* at ¶ 8.  Of these, only one objection was filed with the Court, *Objection to Proposed Settlement*,

and not one objector appeared at the fairness hearing, either personally or through counsel.  The single objection filed in the action expresses Ms. Dutt's dissatisfaction with the legal profession generally and voices concern – not about the substantive terms of settlement – but about the amount of the proposed attorneys' fees award.  Although a small number of objections is not by itself clear evidence of shareholder-wide approval of the settlement, that fact can give rise to an inference that most of the shareholders had no qualms with the proposed settlement.  *See Olden v. Gardner*, 294 F. App'x 210, 217 (6th Cir. 2008) (finding that 79 objections in a class of nearly 11,000 members "tends to support a finding that the settlement is fair").  *See also In re Delphi Corp. Sec., Derivative & "ERISA" Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) ("If only a small number [of opt outs or objections] are received, that fact can be viewed as indicative of the adequacy of the settlement.") (internal quotations omitted; alteration in original); *Hainey v. Parrott,* 617 F.Supp. 2d 668, 675 (S.D. Ohio 2007) ("Generally, however, a small number of objections, particularly in a class of this size, indicates that the settlement is fair, reasonable and adequate.").  This Court therefore concludes that the number of objections in relation to the number of shareholders who received notice supports a finding that the proposed settlement is fair, reasonable, and adequate.

**H.   The Public Interest**

The public interest also favors approval of the proposed settlement.  First, "[t]here is a strong public interest in encouraging settlement of complex litigation and class action suits

because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (quoting *Granada Invs., Inc.*, 962 F.2d at 1205). *Accord In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-00249, 2009 WL 8747486, at *8 (S.D. Ohio Aug. 19, 2009) ("[T]here is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve."). Second, the proposed settlement ends potentially long and protracted litigation and frees up judicial resources. *See In re Telectronics*, 137 F.Supp. 2d at 1025. More importantly, the proposed settlement will provide for immediate ethical and internal control reforms and reforms to Abercrombie's executive compensation structure that directly address the alleged wrongful conduct that gave rise to this action. Accordingly, the Court concludes that the proposed settlement serves the public interest.

In short, and considering all the relevant factors, this Court concludes that the proposed settlement provides a substantial benefit to Abercrombie and its shareholders and is fair, reasonable, and adequate.

## IV. Attorneys' Fees and Costs

The *Amended Stipulation and Agreement of Settlement* provides that Abercrombie will pay attorneys' fees, expenses, and costs as awarded by the Court, not to exceed $2,775,000. *Amended Stipulation and Agreement of Settlement*, ¶ 37. On December 1, 2014, plaintiff filed a motion for an award of attorneys' fees and expenses in the amount of

$2,775,000.  The individual defendants and Abercrombie agreed not to oppose or otherwise take any position adverse to plaintiff's fee application.  *Id.*

Plaintiff's successful prosecution of this derivative action justifies an award of reasonable attorneys' fees.  *See Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1194 (6th Cir. 1974) (citing *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970)); *Shlensky*, 574 F.2d at 149.  Plaintiff proposes that an award based on the lodestar method of calculation is appropriate, and this Court agrees with that proposition.  Notably, the proposed settlement does not provide for a common fund and, as discussed *supra*, the exact value of the resulting benefit to Abercrombie and to its shareholders cannot be precisely determined.  The lodestar method will account for the amount of work performed by counsel and will ensure that counsel is fairly compensated for the results achieved.  *See Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005).

In determining an appropriate "lodestar" figure, a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate.  *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  The court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation."  *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citing

*Reed v. Rhodes*, 179 F.3d 453, 471-72 (6th Cir. 1999)).  In assessing the reasonableness of a fee award, courts

> [o]ften, but by no means invariably, . . . address these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides."

*Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)). *See also Ramey*, 508 F.2d at 1196.

Plaintiff's counsel submits that, as of November 27, 2014, the firms Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), Strauss Troy Co., LPA ("Strauss Troy"), and Klausner Kaufman Jensen & Levinson ("Klausner Kaufman") have billed 1,183.25 hours for a total lodestar value of $644,142.50. *Lebovitch Declaration*, ¶¶ 34-40, Exhibit G. Plaintiff also submits that BLB&G has incurred "$38,646.58 in expenses in connection with the prosecution of this litigation." *Id.* Plaintiff supports its fee request with evidence of the hours expended and hourly rates for each individual who worked on this matter, and evidence of the experience of certain such individuals, as follows:[2]

---

[2] Plaintiff seeks $118,650 for work performed by Mark Lebovitch.  It appears that plaintiff miscalculated this amount and should have sought $128,650. 166 hours x $775 per hour = $128,650.

| **Attorneys** | | | | | |
| --- | --- | --- | --- | --- | --- |
| **Name** | **Title - Firm** | **Experience** | **Hours** | **Hourly Rate** | **Total** |
| Max Berger | Partner - BLB&G | 43 years | 7.5 | $975.00 | $7,312.50 |
| Mark Lebovitch | Partner - BLB&G | 15 years | 166 | $775.00 | $118,650.00 |
| David Wales | Partner - BLB&G | 14 years | 14.5 | $800.00 | $11,600.00 |
| Rochelle Hansen | Senior Counsel - BLB&G | 35 years | 7.75 | $700.00 | $5,425.00 |
| Adam Hollander | Associate - BLB&G | 8 years | 366.25 | $525.00 | $192,281.25 |
| Stefanie Sundel | Associate - BLB&G | 10 years | 29 | $550.00 | $15,950.00 |
| John Mills | Associate - BLB&G | 15 years | 66.25 | $550.00 | $36,437.50 |
| Jeremy Friedman | Associate - BLB&G | Unknown | 3.75 | $525.00 | $1,968.75 |
| David Duncan | Associate - BLB&G | 17 years | 5.5 | $550.00 | $3,025.00 |
| Addison Golladay | Staff Atty - BLB&G | Unknown | 33.5 | $375.00 | $12,562.50 |
| Abbie Rea | Staff Atty - BLB&G | Unknown | 97.25 | $340.00 | $33,065.00 |
| Lewis Smith | Staff Atty - BLB&G | Unknown | 39.5 | $340.00 | $13,430.00 |
| Richard Wayne | Partner - Strauss Troy | Unknown | 96.5 | $725.00 | $69,962.50 |
| Robert Sparks | Partner - Strauss Troy | Unknown | 74.9 | $650.00 | $48,685.00 |
| Robert Klausner | Partner - Klausner Kaufman | Unknown | 35 | $750.00 | $26,250 |
| Stuart Kaufman | Partner - Klausner Kaufman | Unknown | 12.6 | $500.00 | $6,300 |
| | | **TOTAL:** | 1055.75 | | $602,905 |

| Non-Attorneys | | | | | |
|---|---|---|---|---|---|
| **Name** | **Title - Firm** | **Experience** | **Hours** | **Hourly Rate** | **Total** |
| Adam  Weinschel | Director of Institutional Investor Services - BLB&G | Unknown | 7.5 | $415.00 | $3,112.50 |
| Nick Defilippis | Director of Financial Analysis - BLB&G | Unknown | 14 | $500.00 | $7,000.00 |
| Kenneth Cardwell | Case Manager - BLB&G | Unknown | 29 | $310.00 | $8,990.00 |
| Errol Hall | Managing Clerk - BLB&G | Unknown | 5 | $310.00 | $1,550.00 |
| Matthew Mahady | Paralegal - BLB&G | Unknown | 0.5 | $285.00 | $142.50 |
| Andrea Webster | Litigation Support - BLB&G | Unknown | 4 | $310.00 | $1,240.00 |
| Babatunde Pedro | Litigation Support - BLB&G | Unknown | 38.5 | $275.00 | $10,587.50 |
| Michelle Miklus | Financial Analyst - BLB&G | Unknown | 7 | $325.00 | $2,275.00 |
| Rochelle Moses | Financial Analyst - BLB&G | Unknown | 4.5 | $325.00 | $1,462.50 |
| Tanjila Sultana | Financial Analyst - BLB&G | Unknown | 5.5 | $325.00 | $1,787.50 |
| Dalia El-Newehy | Marketing Assistant - BLB&G | Unknown | 5 | $225.00 | $1,125.00 |
| Amy Bitkower | Investigator - BLB&G | Unknown | 1 | $495.00 | $495.00 |
| Chris Altiery | Investigator - BLB&G | Unknown | 6 | $245.00 | $1,470.00 |
| | | **TOTAL:** | 127.5 | | $41,237.50 |
| | | | 1183.25 | | $644,142.50 |

*Id.*  Plaintiff has not, however, provided any evidence whatsoever of the reasonableness of the hours expended or of the rates charged.  *See Transcript of Fairness Hearing*, *PAGEID* #1092-1097.  There is also no evidence that the rates charged are plaintiff's counsel's standard hourly rates.  *Id.* Rather, plaintiff's counsel represented at the fairness hearing that the rates charged in this matter were in line with rates charged in a "national [professional] community" and that plaintiff's counsel's rates are lower than the rates charged by competing firms.  *See id.*

25

As noted *supra*, the lodestar figure is calculated by multiplying the proven number of hours reasonably expended on the litigation by a reasonable hourly rate.  *See Grandview Raceway*, 46 F.3d at 1401.  As to the first determination, the Court concludes that the number of hours expended on this litigation is reasonable.  Plaintiff spent more than eight months investigating the claims asserted in this action before filing the *Complaint;* counsel also reviewed more than 21,000 documents produced in response to the Section 220 demands.  Moreover, the complexity of the case, the use of experts, the nature and quality of the filings, the time constraints surrounding certain of the filings, *see, e.g., Motion for Reconsideration,* ECF 15, and the results ultimately achieved all support the conclusion that the number of hours expended in this matter was reasonable.  Although the better practice would have been to submit more detailed records of the time expended in the litigation, *see e.g.,* *Imwalle v. Reliance Med. Prods., Inc.,* 515 F.3d 531, 553 (6th Cir. 2008) ("The key requirement for an award of attorney fees is that '[t]he documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.' . . . Although counsel need not 'record in great detail' each minute he or she spent on an item, 'the general subject matter should be identified.'") (internal citations omitted); *Rawlings*, 9 F.3d at 516-17 ("District courts must pore over time sheets . . . ."); *Lonardo v. Travelers Indemnity Co.*, 706 F.Supp. 2d 766, 793 (N.D. Ohio 2010) (detailing the time and rate for every hour

expended on the litigation), this Court is satisfied that the number of hours billed by plaintiff's counsel is reasonable.

The Court now turns to the reasonableness of plaintiff's counsel's hourly rates. "A trial court, in calculating the 'reasonable hourly rate' component of the lodestar computation, should initially assess the '*prevailing market rate in the relevant community*.'" *Adcock-Ladd*, 227 F.3d at 350 (emphasis in original) (quoting *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). "The prevailing market rate is 'that rate which lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 821 (6th Cir. 2013) (quoting *Adcock-Ladd*, 227 F.3d at 350). *See also Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 499 (6th Cir. 2011) (quoting *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 618 (6th Cir. 2007)); *Geier v. Sundquist*, 372 F.3d 784, 791 (6th Cir. 2004); *Brian A. v. Hattaway*, 83 F. App'x 692, 694 (6th Cir. 2003). "The appropriate rate, therefore, is not necessarily the exact value sought by a particular firm, but is rather the market rate in the venue sufficient to encourage competent representation." *Gonter*, 510 F.3d at 618 (citing *Lamar Adver. Co. v. Charter Twp. of Van Buren,* 178 F. App'x 498 (6th Cir. 2006)). "A court may, however, award a higher hourly rate for an out-of-town specialist if (1) hiring the out-of-town specialist was reasonable in the first instance, and (2) if the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation."

*Brian A.*, 83 F. App'x at 694 (citing *Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995)).

Plaintiff's counsel represented at the fairness hearing, albeit without supporting evidence, that the rates charged in this litigation are less than those charged by law firms in New York City and that the rates charged are comparable to those charged by large law firms throughout the country. *See Transcript of Fairness Hearing*, *PAGEID* #1092-1097. Plaintiff's counsel's billing rates range from $340 per hour to $975 per hour; the average billing rate exceeds $600 per hour, and only three of plaintiff's sixteen attorneys bill at rates of less than $500 per hour. *Lebovitch Declaration*, Exhibit G.  The latter three attorneys are staff attorneys at BLB&G, and the Court notes that plaintiff has not indicated the level of experience of these individuals.  Similarly, there is no evidence of the qualifications of the two Strauss Troy partners, of the two Klausner Kaufman partners, or of the BLB&G associate.  Plaintiff also itemizes 127.5 hours for work performed by 13 BLB&G employees who are not attorneys, with rates ranging from $225 per hour to $500 per hour, but provides no evidence of the qualifications of these individuals.

The rates specified by plaintiff exceed the average hourly rates charged in Columbus, Ohio. *See, e.g., Gascho*, 2014 WL 1350509 at *34 (attorneys' fees awarded in class action based on rates ranging from $180 per hour to $450 per hour). *See also In re Sulzer Orthopedics, Inc.,* 398 F.3d 778 (6th Cir. 2005); *Johnson v. Midwest Logistics Sys., Ltd.,* No. 2:11-cv-1061, 2013 WL 2295880 (S.D. Ohio May 24, 2013); *Lowther v. AK Steel Corp.,* No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio

Dec. 21, 2012)); *The* Economics of Law Practice *in* Ohio *in 2013*. However, this Court concludes that it was reasonable for plaintiff to hire counsel from outside this forum.  Abercrombie is a corporation with an international presence, plaintiff is a shareholder from Florida, and the issues in this case are complex and not limited to those peculiar to this district.  It is also significant that, in additional to their local counsel, both plaintiff and Abercrombie are presented in this action by national counsel with substantial experience in securities litigation.  *See, e.g., In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-cv-397, 2013 WL 5505744, at *50 (D.N.J. Oct. 1, 2013) (BLB&G has "platinum reputations and records of high achievement in securities class actions."); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 265 n.9 (E.D. Va. 2009); *In re EVCI Career Colls. Holding Corp. Sec. Litig.*, No. 05-cv-10240, 2007 WL 2230177, at *17 (S.D.N.Y. July 27, 2007).  Given plaintiff's counsel's skill, experience, and reputation, and considering the specialized issues presented in this case, it was reasonable for plaintiff to hire out of district specialists. Plaintiff has not, however, justified the reasonableness of the hourly rates requested by it.

Plaintiff's counsel represented at the fairness hearing that the rates sought are consistent with those of large, national law firms. *Transcript of Fairness Hearing*, *PAGEID* #1096-1097. However, there is no evidence that the rates requested by plaintiff's counsel are consistent with the rates for similar services by lawyers of reasonably comparable skill, experience and national reputation. *See Blum*, 465 U.S. at 896 n.11.  Moreover, a review of fee awards

involving plaintiff's counsel suggests that the hourly rates sought in this action are excessive. *See Four in One Co., Inc., v. S.K. Foods, L.P.*, No. 2:08-cv-3017, 2014 WL 4078232, at *13 (E.D. Cal. Aug. 14, 2014) ("Further, the average hourly rate of $436 is not extraordinarily high considering plaintiffs' counsels' experience and skill in complex antitrust class action litigation, and the rates approved in other local class action cases."); *In re Schering-Plough Corp. Enhance Sec. Litig.*, 2013 WL 5505744 at *50 (calculating lodestar based on a blended hourly rate of $471.16); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 377 (S.D.N.Y. 2013) (suggesting that $385 per hour is excessive for staff attorneys and that $300 per hour "appears to be either appropriate or slightly high"); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, No. 09-cv-686, 2012 WL 2064907, at *1 (S.D.N.Y. June 7, 2012) (calculating lodestar based on a blended hourly rate of $454.15); *In re Washington Mut., Inc. Sec. Litig.*, No. 08-MD-1919 MJP, 2011 WL 8190466, at *1 (W.D. Wash. Nov. 4, 2011) (capping rates of partners at $525 per hour); *In re UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151, 1159 (D. Minn. 2009) (capping hourly rates at $500 per hour for partners, $200 per hour for other attorneys, and $100 per hour for paralegals, where plaintiff's counsel sought a blended hourly rate of $451); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. at 265 n.9 (calculating the lodestar for BLB&G based on a blended hourly rate of $391.96 per hour); *In re Suprema Specialties, Inc. Sec. Litig.*, No. 02-168WHW, 2008 WL 906254, at *11 (D.N.J. Mar. 31, 2008) (calculating lodestar based on a blended hourly rate of $413.29); *In re EVCI Career Colls.*

*Holding Corp. Sec. Litig.*, 2007 WL 2230177 at *17 (calculating lodestar based on a blended hourly rate of $426.45).  In comparison, plaintiff's counsel seeks a blended hourly rate of $544.38 for all services rendered in this litigation.  *See Lebovitch Declaration*, Exhibit G.  Because plaintiff has failed to justify the reasonableness of its counsel's hourly rates, the Court will award fees based on rates that lawyers of comparable skill and experience can reasonably expect to command within the venue of this Court.

　　This Court often looks to the Ohio State Bar Association survey *The Economics of Law Practice in* Ohio *in 2013* in determining reasonable hourly rates.  *See e.g.*, *Iron Workers Dist. Council of S. Ohio & Vicinity Benefit Trust v. Millennium Steel, Inc.*, No. 3:11-cv-152, 2012 WL 3527228, at *1 (S.D. Ohio Aug. 14, 2012).  According to *The Economics of Law Practice in* Ohio *in 2013*, only five percent of attorneys in Ohio law firms with more than 50 attorneys bill at hourly rates of $625 or more.  This figure is consistent with the Court's experience that $625 per hour falls at the upper end of reasonableness for experienced attorneys practicing complex litigation in this venue.  However, considering plaintiff's counsel's skill, expertise, and reputation, the complexity of the case, and the number of attorneys in the venue who pursue derivative actions, the Court is of the opinion that plaintiff's counsel can expect to command a premium within this venue.  Accordingly, the Court will cap plaintiff's counsel's hourly rates at $625 per hour.

　　Plaintiff also seeks between $340 and $375 per hour for work performed by three staff attorneys.  As noted *supra*, there is no

evidence in the record of the qualifications of these attorneys.  Two of the three staff attorneys were "involved in assisting with investigating initial claims and reviewing document productions," *Lebovitch Declaration*, ¶ 37, but there is no evidence relating to the work performed by the third staff attorney.  Considering the work performed and the lack of evidence of the staff attorneys' qualifications or experience, the Court finds that $185 per hour is a reasonable rate for the staff attorneys.

Plaintiff also seeks $285 per hour for work performed by a paralegal.  *Lebovitch Declaration*, ¶ 37.  Again, there is no evidence of the paralegal's qualifications nor is there any specification of the particular work performed by that paralegal.  Moreover, the Court finds that plaintiff's requested rate is more than double the hourly rates recently approved for paralegals by this Court.  *See Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, No. 2:10-cv-00789, 2014 WL 5034643, at *8 (S.D. Ohio Oct. 8, 2014) ($125 per hour for paralegals); *Castro v. Los Camperos, Inc.*, No. 2:13-cv-1186, 2014 WL 4626292, at *4 (S.D. Ohio Sept. 15, 2014) ("Considering that only 10.3 percent of paralegals in the greater Columbus area bill at a rate over $130 per hour, *see The Economics of Law Practice in Ohio in 2013,* p. 43, . . . ."); *Javery v. Lucent Techs. Inc. Long-Term Disability Plan for Mgmt. or LBA Emps.*, No. 2:09-cv-00008, 2014 WL 2779427, at *8 (S.D. Ohio June 19, 2014) ($125 per hour for paralegals); *Wilson v. D & N Masonry, Inc.*, No. 1:12-cv-922, 2014 WL 1789136, at *2 (S.D. Ohio May 5, 2014) ($125 per hour for paralegals).  Accordingly, the Court will limit the hourly rate for paralegals to $125 per hour.

Plaintiff next seeks $8,990 in fees for 29 hours of work performed by Kenneth Cardwell at the rate of $310 per hour.  Mr. Cardwell is identified a Case Manager at BLB&G who "was involved in assisting with investigating initial claims and supported the attorneys working on the litigation by assisting with the review, filing, and service of pleadings, and calendaring litigation dates and monitoring relevant SEC filings and news sources." *Lebovitch Declaration*, ¶ 37.  It appears from this description that Mr. Cardwell performed mostly clerical work, which is not ordinarily separately billed in a request for an award of attorneys' fees. *See, e.g.*, *Missouri v. Jenkins,* 491 U.S. 274, 288 n. 10 (1989).  The time billed by Kenneth Cardwell will therefore be excluded.

Plaintiff also seeks fees for work performed by several individuals who appear to be employees of BLB&G, including a Director of Institutional Investor Services, Director of Financial Analysis, Managing Clerk, two people in Litigation Support, three Financial Analysts, one Marketing Assistant, and two Investigators. *See Lebovitch Declaration*, Exhibit G.  These individuals billed almost 100 hours at rates ranging from $225 per hour to $500 per hour.  *Id.* Plaintiff has offered no evidence of these individuals' experience nor has plaintiff explained how these individuals advanced the litigation. Without such information, the Court simply cannot assess the reasonableness of the hourly rates charged by these individuals nor can the Court determine whether these individuals performed tasks that should be included in an award of attorneys' fees.  Accordingly, the time billed by Adam Weinschel, Nick Defilippis, Errol Hall, Andrea

33

Webster, Babatunde Pedro, Michelle Miklus, Rochelle Moses, Tanjila Sultana, Dalia El-Newehy, Amy Bitkower, and Chris Altiery will be excluded from the lodestar calculation.

Considering the foregoing, the Court calculates plaintiff's counsel's lodestar value at $538,865:

| Attorneys | | | | | |
|---|---|---|---|---|---|
| **Name** | **Title - Firm** | **Experience** | **Hours** | **Hourly Rate** | **Total** |
| Max Berger | Partner - BLB&G | 43 years | 7.5 | $625.00 | $4,687.50 |
| Mark Lebovitch | Partner - BLB&G | 15 years | 166 | $625.00 | $103,750.00 |
| David Wales | Partner - BLB&G | 14 years | 14.5 | $625.00 | $9,062.50 |
| Rochelle Hansen | Senior Counsel - BLB&G | 35 years | 7.75 | $625.00 | $4,843.75 |
| Adam Hollander | Associate - BLB&G | 8 years | 366.25 | $525.00 | $192,281.25 |
| Stefanie Sundel | Associate - BLB&G | 10 years | 29 | $550.00 | $15,950.00 |
| John Mills | Associate - BLB&G | 15 years | 66.25 | $550.00 | $36,437.50 |
| Jeremy Friedman | Associate - BLB&G | Unknown | 3.75 | $525.00 | $1,968.75 |
| David Duncan | Associate - BLB&G | 17 years | 5.5 | $550.00 | $3,025.00 |
| Addison Golladay | Staff Atty - BLB&G | Unknown | 33.5 | $185.00 | $6,197.50 |
| Abbie Rea | Staff Atty - BLB&G | Unknown | 97.25 | $185.00 | $17,991.25 |
| Lewis Smith | Staff Atty - BLB&G | Unknown | 39.5 | $185.00 | $7,307.50 |
| Richard Wayne | Partner - Strauss Troy | Unknown | 96.5 | $625.00 | $60,312.50 |
| Robert Sparks | Partner - Strauss Troy | Unknown | 74.9 | $625.00 | $46,812.50 |
| Robert Klausner | Partner - Klausner Kaufman | Unknown | 35 | $625.00 | $21,875.00 |
| Stuart Kaufman | Partner - Klausner Kaufman | Unknown | 12.6 | $500.00 | $6,300.00 |
| Matthew Mahady | Paralegal - BLB&G | Unknown | 0.5 | $125.00 | $62.50 |
| | | **TOTAL:** | 1056.25 | | $538,865 |

As discussed *supra*, the Court may, "within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd*, 227 F.3d at 349 (quoting *Reed,* 179 F.3d at 471-72). In adjusting the lodestar to arrive at a reasonable fee award, a court may consider the following factors:

"(1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Id.* at 349 n.8 (quoting *Reed,* 179 F.3d at 471-72 n. 3). Of these factors, the "results obtained" is the most important factor in determining the reasonableness of a fee award. *Kentucky Rest. Concepts Inc. v. City of Louisville*, 117 F. App'x 415, 420 (6th Cir. 2004) (citing *Hensley*, 461 U.S. at 434-36). *See also Adcock-Ladd*, 227 F.3d at 349 ("A highly important *Johnson* factor is the *result achieved.*") (emphasis in original).

As discussed *supra*, the proposed settlement provides a substantial benefit to Abercrombie and its shareholders. With the help of BHJ, the parties were able to identify and remedy specific deficiencies (or perceived deficiencies) in Abercrombie's corporate governance and compensation structure. The proposed settlement provides for, *inter alia*, the utilization of GAAP performance metrics in determining executive compensation; significant changes to Abercrombie's code of business conduct and ethics, which include the appointment of a Chief Ethics and Compliance Officer; and internal controls to protect proprietary information. The proposed settlement specifically addresses the alleged misconduct in the *Complaint*, it provides for immediate relief without the expense of years of litigation, it provides more targeted relief than what likely could

35

have been secured at trial and, according to BHJ, Abercrombie will be in a position to flourish financially after the proposed settlement is implemented.  The proposed settlement also achieves the socially laudable goal of promoting ethical behavior in the corporate realm.[3]

As noted *supra*, derivative litigation is inherently complex and the prosecution of such actions typically requires specialized skill. Plaintiff's counsel also undertook the litigation on a contingent fee basis and devoted substantial time and energy to the action despite the risk associated with such fee arrangements. Indeed, the risk presented in this litigation was significant: plaintiff's counsel devoted more than 1000 hours in connection with the litigation without any guarantee of compensation.  There is a substantial public interest in compensating counsel at a rate that takes into account not only the work performed but also the risk of undertaking representation on a contingent basis.  It is also significant that plaintiff's counsel has not sought fees for work performed after November 27, 2014, including time spent at, and preparing for, the fairness hearing.  Moreover, it is worth noting that, although 35,332 stockholders were informed of the potential for an award of attorneys' fees and costs, and of the amount of fees and costs sought, *Notice*, ECF 25, p. 8; *Affidavit of Mailing*, ¶ 8; the Court received only one general objection.

Plaintiff seeks $2,775,000 in attorneys' fees based on a lodestar multiplier of 4.2; after reductions in the lodestar value as calculated *supra*, a $2,775,000 award would yield a multiplier of 5.08.

---

[3] The Court notes, however, that the proposed changes to compensation may have been implemented by Abercrombie prior to the filing of this action.  *See Complaint*, ¶¶ 109-16; *Amended Stipulation and Agreement of Settlement*, ¶ 34 (referring to some reforms as "already adopted").

Plaintiff asks the Court to consider both the benefits obtained as a result of the proposed settlement and the fees awarded in several particular cases involving non-monetary settlements similar to the proposed settlement in this action.  The cases cited by plaintiff support a finding that the benefits of enhancing corporate governance to better align executive compensation with performance and remedying ethical and compliance failures are significant.  *See Plaintiff's Memorandum*, pp. 34-36.  Moreover, every case cited by plaintiff authorized a fee award that far exceeds the requested fees in this case.  *Id.*  However, the cases cited by plaintiff that actually discuss the lodestar value and calculate a lodestar multiplier all awarded fees based on a multiplier between 1.25 and 2.29.  *In re Schering-Plough Corp. S'holders Derivative Litig.*, No. 01-cv-1412, 2008 WL 185809, at *6 (D.N.J. Jan. 14, 2008) (awarding $9.5 million in attorneys' fee, which represented a 1.37 multiplier); *Lambrecht v. Taurel*, No. 1:08-cv-68, 2010 WL 2985943, at *1 (S.D. Ind. July 27, 2010) (awarding $8.75 million in attorneys' fees, which represented a 1.25 multiplier); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02-cv-6302, 2010 WL 363113, at *1 (S.D.N.Y. Feb. 1, 2010) (awarding $9.6 million in attorneys' fees, which represented a 1.60 multiplier); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d 229, 237 (S.D.N.Y. 2005) (awarding $11,937,696.78 in attorneys' fees, which represented a 2.29 multiplier).  These cases suggest that, although the benefits obtained by the proposed settlement may be significant, they do not necessarily warrant the fees requested by plaintiff.

Plaintiff has also referred to cases involving a common-fund that resulted in multipliers greater than 5. *Conley v. Sears, Roebuck & Co.*, 222 B.R. 181, 183 (D. Mass. 1998) (applying a multiplier of 8.9). However, courts typically award attorneys' fees in cases such as this based on a lodestar multiplier between 1.25 and 5. *In re Nat. Century Fin. Enters., Inc. Inv. Litig.*, No. 2:03-MD-1565, 2009 WL 1473975, at *3 (S.D. Ohio May 27, 2009) ("The court further notes that courts typically award attorneys' fees in securities class action in an amount that is ultimately a lodestar multiplier of anywhere from 1.3 to 4.5.") (citing *In re Cardinal Health Inc. Sec. Litig.,* 528 F. Supp. 2d 752, 767 (S.D. Ohio 2007)); *In re Nationwide Fin. Servs. Litig.*, 2009 WL 8747486 at *15 (applying a 2.42 multiplier); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("In shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation.") (citing *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28)); *Lambrecht*, 2010 WL 2985943 at *1 (awarding $8.75 million in attorneys' fees, which represented a 1.25 multiplier).

Considering the benefits of the proposed settlement, the risk undertaken by plaintiff's counsel, the skill of counsel for both sides, society's stake in rewarding attorneys for the benefits secured, and the complexity and duration of the litigation, all discussed *supra*, the Court finds that a lodestar multiplier of 3 is appropriate in this case. The cases cited by plaintiff as having analogous, albeit possibly less significant, non-monetary relief

applied smaller lodestar multipliers.  *See In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809 at *6 (1.37 multiplier); *Lambrecht*, 2010 WL 2985943 at *1 (1.25 multiplier); *In re AOL Time Warner S'holder Derivative Litig.*, 2010 WL 363113 at *1 (1.60 multiplier); *In re Bristol-Myers Squibb Sec. Litig.*, 361 F. Supp. 2d at 237 (2.29 multiplier).  However, the Court concludes that a higher multiplier is appropriate here, given the skill of counsel, the risk undertaken by counsel, and counsel's ability to quickly resolve the dispute on favorable terms.  This finding is consistent with plaintiff's counsel's representation at the fairness hearing that a multiplier between three and five would be reasonable.  *See Transcript of Fairness Hearing*, *PAGEID* #1099 (representing that "the precedents support [a lodestar multiplier] anywhere from 3 to 5").  Applying a multiplier of 3 to the lodestar value calculated *supra*, the Court concludes that plaintiff is entitled to an award of reasonable attorneys' fees in the amount of $1,616,595.  Additionally, the Court finds that plaintiff is entitled to expenses in the amount of $38,646.58.

    **WHEREFORE**, based on the foregoing, it is **RECOMMENDED** that *Plaintiff's Motion for Final Approval of Derivative Litigation Settlement and Award of Attorneys' Fees and Reimbursement of Expenses*, ECF 22, be **GRANTED in part** and **DENIED in part**.

    It is **RECOMMENDED** that, because the proposed settlement of the action on the terms set forth in the *Amended Stipulation and Agreement of Settlement*, ECF 18-1, is fair, reasonable, and adequate, the

*Amended Stipulation and Agreement of Settlement* should be finally approved by the Court.

It is further **RECOMMENDED** that plaintiff's counsel be **AWARDED** reasonable fees and reimbursement of expenses in the total amount of $1,655,241.58.


If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to de novo review by the District Judge and of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); Smith v. Detroit Fed'n of Teachers, Local 231 etc., 829 F.2d 1370 (6th Cir. 1987); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).


December 29, 2014                          *s/Norah McCann King*
                                        Norah M^cCann King
                                United States Magistrate Judge